**Andras John PEDERSEN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 621.**

Supreme Court of Alaska.

Nov. 18, 1966.

Robert J. Annis, Robertson, Monagle, Eastaugh & Annis, Juneau, for appellant.

Jack O'Hair Asher, Dist. Atty., Juneau, for appellee.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

## OPINION

RABINOWITZ, Justice.

The tragic odyssey of the *Sitka* and its crew began in the spring of 1963 at Crescent City, California, and ended at Kelp Bay in the coastal waters of Alaska. On May 20, 1963, while the *Sitka* lay anchored off Pond Island in Kelp Bay, Lawrence (Tiny) Tabor was severely wounded in the abdomen by a shotgun blast.[1] Tiny Tabor died later that evening during emergency surgery after having been flown by the Coast Guard to Juneau.

Subsequently an indictment was returned in which appellant was charged with the first degree murder of Lawrence Tabor. Appellant was found guilty of the lesser included offense of manslaughter[2] and was thereafter sentenced to eight years' imprisonment.[3]

In this appeal appellant has enumerated nineteen separate specifications of

---

1. The report of the doctor who attended Tabor at the time of his death characterizes the injury as a "severe shotgun wound to the abdomen with massive intra-abdominal organ destruction and massive hemorrhage."

Dr. Robert Smalley also testified as to his autopsy findings. Dr. Smalley observed a head-on wound, perpendicular to the skin, to the right upper portion of decedent's abdomen. The autopsy further revealed that the decedent's bowel had been "absolutely" lost—that the entire transverse colon was in shreds and the right colon "peppered like a watering can." The doctor testified that Tiny died on the operating table.

2. After a nine day trial the jury returned a verdict on April 15, 1965. In part, this verdict reads:

 [F]ind the defendant, Andras John Pedersen, not guilty of Murder in any degree, but guilty of Manslaughter as an included crime contained within the charge set forth in the indictment.

3. The judgment and commitment entered by the superior court on May 17, 1965, also provided that appellant's term of incarceration was to be suspended after the expiration of two years upon certain conditions.

error.[4] We have carefully reviewed the entire record in this case and have concluded that appellant's conviction of manslaughter should be affirmed. We are of the opinion that there is sufficient evidence to support a manslaughter conviction and that most of the asserted errors are without any merit.[5]

In determining questions as to the sufficiency of the prosecution's evidence, this court views "the facts and reasonable inferences therefrom in the light most favorable to the state."[6] In Jennings v. State[7] we said:

> [T]hat a case should be submitted to the jury only if fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt had been established beyond a reasonable doubt. If they could not differ, but must necessarily have such a doubt, then a judgment of acquittal should be granted.[8]

We hold that the superior court did not err in denying appellant's motion for judgment of acquittal made at the conclusion of all the testimony, because the evidence presented jury questions as to appellant's guilt or innocence.

The evidence disclosed that appellant, the deceased, and a young man named Jack Jenkins agreed to undertake a crab fishing venture in Alaskan waters. Appellant's boat, the *Sitka,* was outfitted for processing crabs. It was also agreed that the *Lorayne,* owned by Alton Nairin and manned by Nairin, his wife, and his step-son, Drew Roberts, was to participate in the venture. As the *Sitka* worked its way up the coast from Bellingham, Washington, to Ketchikan, Alaska, differences of opinions and arguments developed between the appellant and the deceased.[9] On the morning of the fatal shooting, appellant and the deceased had in fact decided to end their "operation" so they left Hood Bay for Kelp Bay to rendezvous with their auxiliary ship the *Lorayne.*

What transpired while the *Sitka* awaited the arrival of the *Lorayne* that day is the subject of conflicting versions. Initially appellant contended that his 12-gauge shotgun had accidentally fired and wounded Tiny Tabor. Later, some three days after the shooting, appellant claimed that he had fired at Tiny in self-defense. The evidence was uncontradicted that Tiny was unarmed at the time he was shot.[10]

As to the crucial events which preceded the shooting, Jack Jenkins' testimony shows that after the *Sitka* had reached Kelp Bay, appellant and Jack Jenkins went ashore to hunt game. After a short unsuccessful hunt, they returned to the ship. It was at this time that an argument between Tiny and appellant took place in the wheelhouse. Jack Jenkins intervened and Tiny then left

4. Remarkably appellant in his opening and reply briefs has not cited any authority in support of no less than seventeen of his specifications of error.

5. If the adversary system is to function at the appellate level, counsel's participation and minimal compliance with the rules of this court are necessary.

6. Watson v. State, 413 P.2d 22, 26 (Alaska 1966); see also Jennings v. State, 404 P.2d 652 (Alaska 1965); Bush v. State, 397 P.2d 616 (Alaska 1964); Davis v. State, 369 P.2d 879 (Alaska 1962).

7. 404 P.2d 652, 654 (Alaska 1965).

8. In Rank v. State, 373 P.2d 734, 737 (Alaska 1962), in regard to a sufficiency of evidence issue, we stated:
 In reviewing the record, with recognition of the province of the jury to judge the credibility of witnesses, to consider the evidence and to draw justifiable inferences from it, we find that the state proved its case.
 Other decisions of this court that have dealt with the question of the sufficiency of the evidence are: Beck v. State, 408 P.2d 996 (Alaska 1965); Selman v. State, 406 P.2d 181 (Alaska 1965); Daniels v. State, 388 P.2d 813 (Alaska 1964); Goss v. State, 369 P.2d 884 (Alaska 1962).

9. On this point, as with most of the events we are going to refer to, the jury heard conflicting testimony.

10. Also undisputed was the fact that Tiny had been shot by appellant's 12-gauge shotgun.

the wheelhouse. Appellant then suggested to Jenkins that the two of them go grouse hunting. Jenkins climbed down into the skiff which was moored alongside of the *Sitka*. Appellant came over to the railing above the skiff, and swung one leg over the railing.[11] At this moment Tiny started a conversation with appellant about the possibility of their reaching an agreement to operate if appellant would consent to certain conditions. Appellant turned Tiny down, and Tiny then became very excited, angry, and began shouting. The next thing Jenkins heard was a shot, looked up, and saw a shotgun in appellant's hand pointing up at a 45° angle. Jenkins also observed appellant "just staring," heard Tiny moan, and appellant plead with Tiny to let him help him by calling the Coast Guard.

Jenkins then testified that he then heard Tiny say he was going to get a gun and kill appellant. Appellant renewed his pleas to Tiny, who, at that moment, was observed going toward the wheelhouse. Appellant and Jenkins, to avoid being fired upon, rowed to land approximately ¼ mile away. Jenkins testified that it was during this trip that appellant mentioned something like "if he would have only given me the gun first, after all these years and he's never had an accident." Appellant and Jenkins returned to the *Sitka* after the *Lorayne* had arrived on the scene and while a rescue plane from the Coast Guard was in the process of moving Tiny from the ship.

Both Alton Nairin and Drew Roberts of the *Lorayne* testified that they received a radio call from Tiny stating that he had been shot by appellant and needed help. These witnesses testified that after they boarded the *Sitka*, Tiny told them that appellant had shot him. According to Roberts, Tiny said, "that they had had a small argument and Jack had shot him." [12] Roberts also testified as to his observations of blood on the *Sitka* and to his seeing a great deal of blood located in a circle about four feet high on the ship's mast.

United States Coast Guard hospital corpsman Joseph Casey related that Tiny said that "he didn't want for them to say that it was an accident" and also told him "that he got shot as a result of a little argument * * * that he got hit in the gut with a 12 gauge from fifteen feet * * *." The witness also told the jury that in rendering emergency aid to the deceased he observed that his wound was the "size of a regulation baseball."

Lieutenant J. G. Frank Devine, a police intelligence officer in the Coast Guard, testified that during the flight from Kelp Bay back to Juneau he had asked appellant and Jenkins what had happened, and appellant told him that "there had been an accidental shooting."[13]

Officer Harold Hume of the Alaska State Police then related that while on the operating table, Tiny stated appellant had shot him with a 12-gauge shotgun from fifteen feet; that they had been arguing and "watch them say it was an accident." Officer Hume further testified that during an interview on the evening of May 23, 1963, appellant informed him that the shooting "was accidental, that he didn't know how the gun went off." Officer Hume then identified a written statement which he had participated in subsequently obtaining from appellant. In this statement appellant said in part:

> I took the gun—to continue grous-hunt [sic] again, this was an excuse to get away from Tiny. I moved out of the wheel house down across the hatch and at that time Jack was already in the boat. Tiny followed along behind and then he said that he would go along with the operation if they would do their putting the skiff over the side and Jack shot me."

11. At this point Jenkins was standing up in the skiff holding it to the *Sitka* whose railing was higher than Jenkins' head.

12. Alton Nairin's testimony was that Tiny told him "we got into an argument about

13. Officer Devine further testified that Jenkins immediately acknowledged that the shooting had been accidental.

own work. Then he yelled out Hell that well [sic] never work, and then he started screaming—I don't remember the exact words—then he started coming towards me. I pointed the gun off in his direction when I saw that he was still coming, and I pulled the trigger.[14]

Officer Robert Penman of the Alaska State Police testified that appellant told him "that he bumped the gun or something and it went off." [15] This witness also stated that in his opinion, based on his observation of the blood configurations on the various parts of the *Sitka,* Tiny was standing within three to fifteen inches from the mast when he was shot. The officer also testified that in his opinion (based on ballistic tests) appellant was ten to thirteen feet away from the deceased at the time the shooting occurred.

The state's last witness, Officer David Oehler of the Alaska State Police, told the jury that appellant's explanation of his two versions of the shooting was "that he didn't think he was going to get away with it, he just wanted to see how long he could go or something like that, words to that effect. I'm not positive."

Appellant's version of what transpired in the wheelhouse was that Tiny did not like what he had said, and "he grabbed ahold of me by the front of the shirt, and said that he was going to kick the shit out of me. * . * * When I heard that I told him to go ahead, I couldn't stop him and I asked him what good it would do."

As to the conversation which took place shortly thereafter while appellant was straddling the rail, appellant testified that Tiny

started screaming at me, said he was going to do something, and so he stepped up on the first part of the hatch and I raised up the gun at him and he stopped. I put the gun back down and he came at me again, so I put the gun up here and pulled the trigger. I never seen where I hit him because I turned my head when I held the gun up * * * [in] just a few split seconds I could * * * see myself being gone * * * I'm sorry.

According to the testimony of appellant, Tiny was six to eight feet away when he fired at him.

As we stated previously, a review of the entire record, and in particular the facts alluded to in this truncated summary, have convinced us (viewing the facts and the reasonable inferences therefrom in the most favorable light to the prosecution) that there is sufficient evidence to support the jury's verdict of manslaughter. In short, we are of the opinion that there was adequate evidence produced from which the jury could have reasonably found that appellant unlawfully shot Tiny Tabor.

■ Inherent in this determination is our conclusion that the self-defense issue was properly presented to the jury under the court's instructions. Considering the heavy demeanor factors involved, we are of the view that the self-defense issue was peculiarly a factual issue for the jury's determination. Under the circumstances appearing in this record, we cannot find as a matter of law the self-defense issue should have been resolved in appellant's favor.[16]

---

14. In this statement appellant also said that he "hesitated a couple of three times, and then finally shot—because he didn't stop. * * * Tiny looked like a great big gorilla coming at me—that's why I figured I hit him in the hand."

15. State Trooper David Oehler's testimony also related an accidental version of the shooting which had been given to him by appellant.

16. In regard to the self-defense issue, the jury had before it evidence as to the decedent's enormous (6'4", 270 lbs.) size as opposed to appellant's (5'10¾", 172 lbs.); of decedent's exceptional strength; of decedent's past exploits as a professional boxer and weight lifter. The jury also heard of the decedent's ability as a street fighter; his refined techniques to injure people and of his past sinister

Appellant also assigns as error the denial by the trial court of his motion for new trial.[17] The two grounds urged by appellant in support of his motion were that the verdict was against the weight of the evidence, and that the trial court's curtailment of cross-examination by appellant deprived him of a fair trial and of due process of law. After making pointed reference to the fact that appellant failed to give him the benefit of any authority, or citation to any portions of the record, in support of his curtailment of cross-examination contention, the superior court denied the motion. In reaching this result, the trial judge said that he could not find that the verdict was against the weight of the evidence.

■ The grant or refusal of a new trial lies within the sound discretion of the trial judge.[18] On the record before us we cannot find that the trial court abused its discretion in denying appellant's motion for new trial.[19]

■ Fourteen out of appellant's remaining seventeen specifications of error relate to evidentiary rulings of the trial court.[20] Appellant's first evidentiary point is that the trial court erred in admitting into evidence a "top view" drawing of the vessel *Sitka* during the prosecution's direct examination of its first witness Jack Jenkins. When shown to the witness for identification, Jenkins testified that that was the way he remembered the boat except that "there was a top over the galley." Counsel for appellant then objected to the identification's admission on the ground that the drawing was inaccurate,[21] and for the further reason that the identification had been prepared by Officer Penman. We find no merit in appellant's contentions. This demonstrative exhibit had been identified by Jenkins as a correct representation of the *Sitka* (with the exception noted) as he remembered the vessel. It is not required that the maker of such a drawing lay the foundation for its admission as a prerequisite to its admissibility.[22] Jenkins' testimony furnished a

---

underworld connections. The story of the progressive deterioration in the relationship between the two was before the jury. In detail the increasing arguments were related, as well as the detrimental impact that these arguments had upon appellant's health, physical condition, and state of mind. The jury was also made aware of appellant's good reputation of peacefulness, as opposed to decedent's bad reputation in this regard.

The jury also had before it evidence that previous to the shooting, there had never been any violence between the two men during their arguments. That in the wheelhouse argument which occurred minutes before the shooting, appellant was not touched by the decedent. That things were peaceful that morning as they had agreed to terminate the operation.

In short, it was within the jury's province to weigh the credibility of appellant's and Jenkins' testimony and to determine from all the evidence whether or not appellant's actions constituted self-defense under the court's instructions. The resolution of all conflicts, the weight to be given to any testimony, were matters which were correctly left to the jury on this issue.

17. Crim.R. 33 provides in part:
 The court may grant a new trial to a defendant if required in the interest of justice. * * * A motion for a new trial * * * shall be made within 5 days after verdict or finding of guilt, or within such further time as the court may fix during the 5-day period.

18. West v. State, 409 P.2d 847 (Alaska 1966).

19. Not only was appellant's showing in the superior court as to the deprivation of cross-examination inadequate, but our analysis of the record has led us to conclude that substantively the trial judge ruled correctly as to both aspects of the motion for new trial.

20. Three of the specifications of error are restatements of previous specifications regarding cross-examination rulings.

21. Counsel for appellant argued that he had in his possession photographs of the *Sitka* which did not correspond with the identification.

22. See McCormick, Evidence § 180 (1954); 3 Wigmore, Evidence §§ 793, 794 (3d ed. 1940).

proper foundation for the identification's admission.

Appellant also contends that the court erred in permitting counsel for the state to use this identification in examining the witness Drew Roberts. At one point in his examination Roberts was asked whether he found any blood in a particular area which was referenced to a point indicated on the sketch in question.[23] We find no basis for appellant's assertion that counsel's question was leading or that the drawing was misused in this instance.

■■■ Appellant next contends that error was committed by the trial judge "in overruling the appellant's objections to the method of the appellee's impeachment of * * * [appellee's] witness, Mr. Jack Jenkins." Appellant's position is that the proper method of showing Jenkins' prior inconsistent statements required the "testimony of the officer to whom the statements were made." Criminal Rule 26(a) provides in part that "The admissibility of evidence shall be governed by Civil Rule 43." Criminal Rule 50(b) in its relevant part states: "All other provisions of the Rules of Civil Procedure relating to * * * examining witnesses * * * shall apply to practice in criminal actions in the courts of the state." [24] Review of the record demonstrates that the prosecutor was attempting, in a procedurally correct manner, to lay a

foundation for the impeachment of his own witness. Civil Rule 43(g) (11) [a] specifically authorizes a party to impeach his own witness by showing prior inconsistent statements.[25] Under Civ.R. 43(g) (11) [c] it is required that the inconsistent "statements must first be related to him, with the circumstances of the times, places, and persons present, and the witness shall be asked whether he has made such statements and, if so, shall be allowed to explain them." The prosecution was proceeding in accordance with our rules pertaining to impeachment of a party's own witness through prior inconsistent statements. We find no error.[26]

■■■ A similar objection is voiced to the prosecution's cross-examination of appellant at the point where appellant was asked several questions concerning certain prior inconsistent oral statements. Again, we believe that appellant has misconceived the procedures by which a witness is to be impeached through the use of prior inconsistent statements.[27] Counsel for the prosecution was correctly proceeding in conformity with our rules concerning impeachment.

■■■ Appellant also alleges as error the lower court's exclusion of a "question to the witness Jenkins which included repetition to him of Mr. Jenkins' statement made at the preliminary hearing." No offer of

23. In reference to this exhibit, the witness was asked:
 Would you look in the area where #3 is marked on the chart and where #4 is marked on the chart and the area to the starboard of that. * * *
 And would you tell me whether you found anything there?

24. See Sidney v. State, 408 P.2d 858 (Alaska 1965), and Anderson v. State, 384 P.2d 669 (Alaska 1963), in regard to the applicability of Civ.R. 43 to criminal proceedings.

25. Civ.R. 43(g) (11) [a] reads:
 The party producing a witness may not impeach his credit by evidence of bad character. He may contradict him by other evidence; and he may show that he has made at other times statements inconsistent with his present

testimony, as provided in paragraph [c] of this subdivision.

26. See Hobbs v. State, 359 P.2d 956, 967 (Alaska 1961), where this court said:
 This court subscribes to the view that the discretion of the trial judge shall govern the latitude of examination permitted in impeaching a party's own witness by showing other statements inconsistent with present testimony. The discretion exercised by the trial judge will not be disturbed on appeal unless an obvious abuse has been permitted.

27. Appellant at trial reasserted his position that to show a prior inconsistent statement for impeachment purposes this must be accomplished by calling the person to whom the statement was made. See also Civ.R. 43(g) (11) [b].

proof was made below nor are we favored with any indication as to the relevancy and materiality of the evidence appellant sought to adduce. In such circumstances we cannot find error.[28]

In Crawford v. Rogers [29] we said:

The true criterion in determining whether one qualifies as an expert witness and whether his opinion is admissible is not whether he employs his knowledge and skill professionally or commercially. The true criterion is whether the jury can receive appreciable help from this particular person on this particular subject.

■■■■■ Also pertinent to the question of an expert's qualifications is Wigmore's view that the trial court's determination in this regard should be unreviewable.[30] We choose not to go this far but hold that the decision in regard to the requisite qualifications of an expert witness is left to the trial court's discretion and is reviewable only for abuse. All of which have led us to the determination that appellant's argument that the court "erred in admitting any testimony of the witness Penman as an expert with respect to blood splashings, blood patterns, blood configurations and the proximity of the deceased to the mast" is without merit. From a reading of the applicable portions of the record, we are of the opinion that the trial judge did not abuse

his discretion in ruling on Officer Penman's qualifications in this area. We are of the further view that under the *Crawford* criterion the jury could have received appreciable assistance from this witness on the general subject of blood patterns resulting from gunshot wounds, and its relation to the issue of determination of the location of the decedent at the time he was shot.[31]

In the course of his cross-examination of Officer Hume, appellant's counsel asked the witness:

Did you find that there were any convictions of any crimes such as assault, either of the simple or aggravated kind or any other crimes relating to violence on the part of the deceased?

The trial court then sustained the prosecution's objection to this question on the basis that it called for hearsay. Shortly thereafter appellant's counsel asked the witness "Do you have any certified records of a conviction of this man"? The trial court then sustained an objection as to the form of this question. Appellant now assigns as error these two rulings of the lower court. The only authority we are cited by appellant in his brief in support of his position is Civ.R. 43(g) (11) [b], together with the statement that "The court's ruling on this point violates the spirit" of this rule.[32]

28. After counsel for the prosecution had objected, appellant's trial counsel stated, "On that point, your Honor, I think that evidence to this effect has already come in. This would be lines 11–20."

29. 406 P.2d 189, 192 (Alaska 1965); see Nelson v. State, 387 P.2d 933 (Alaska 1964).

30. 2 Wigmore, Evidence § 561, at 641 (3d ed. 1940); see McCormick, op. cit. supra note 22, § 13, at 29, where the author writes:

The practice, however, in respect to experts' qualifications has not for the most part crystallized in specific rules, but is recognized as a matter for the trial judge's discretion reviewable only for abuse.

31. As to Officer Penman's testimony, appellant further claims that it was error for the court to have sustained an ob-

jection to his question as to "what was told the witness Penman about the size of the decedent's wound." The prosecution objected on the grounds of hearsay. At trial appellant did not make any offer of proof in this regard, or inform the trial court as to the basis for the admissibility of such evidence. All appellant has told us is that this limited his cross-examination. We have not been shown the legal basis for such a question nor have we been informed as to how its exclusion in any way prejudiced appellant's case.

32. Civ.R. 43(g) (11) [b] provides:

A witness may be impeached by the party against whom he was called by contradictory evidence, or by evidence that his general reputation for truth is bad, or that his moral character is such as to render him unworthy of belief. He may not be impeached

We fail to perceive the applicability of this rule of procedure.

 It is established that the reputation of the deceased for a "violent, dangerous, or turbulent disposition" is relevant and material where the accused has asserted self-defense "and an important element in determining his justification is his *belief in an impending attack* by the deceased." [33] It is also held that the actual character of the deceased, although not known by the accused, is admissible

When the issue of self-defense is made in a trial for homicide, and thus a controversy arises *whether the deceased was the aggressor*, one's persuasion will be more or less affected by the character of the deceased; it may throw much light on the probabilities of the deceased's action. * * * [34]

 Appellant has not made a showing that the evidence he sought to elicit was admissible under either of these rules pertaining to the deceased's character in homicide prosecutions. Also pertinent to a discussion of this issue is Wigmore's position that:

When the turbulent character of the deceased, in a prosecution for homicide, is relevant * * * there is no substantial reason against evidencing the character by *particular instances of* violent or quarrelsome *conduct*. Such instances may be very significant; their number

can be controlled by the trial Court's discretion. * * * [35]

There is considerable divergence in the authorities on this question.[36] On the state of this record we need not now decide whether proof of specific acts of violence are admissible in a homicide prosecution on the issue of whether the deceased was the aggressor. Here the record reflects that appellant's question to Officer Hume was found objectionable in regard to form. Appellant has made no showing that he was denied access to records, if any, pertaining to prior convictions of the deceased for crimes of violence. In light of these factors, and in view of the evidence that was before the jury as to appellant's character and specific acts of violence, we are not persuaded that the court committed prejudicial error in sustaining objections to these questions.

Appellant's eight remaining specifications of error concern rulings of the trial court in regard to questions propounded by appellant during cross-examination. We have reviewed all of appellant's contentions on these issues and have concluded that no prejudicial error was committed by the trial court.

Civil Rule 43(g) (7) governs the scope of permissible cross-examination in criminal trials. This rule of procedure provides:

An adverse party may cross examine a witness as to any matter stated in the direct examination or connected there-

by evidence of particular wrongful acts, except that it may be shown by the examination of the witness or the record of a judgment that he has been convicted of a crime.
See Sidney v. State, 408 P.2d 858 (Alaska 1965), as to the applicability of Civ.R. 43(g) (11) [b] to criminal proceedings.

33. 2 Wigmore, op. cit. supra note 30, § 246, at 44. Wigmore later states at 52, "It is assumed throughout that the reputation offered was *known to the defendant*."

34. 1 Wigmore, Evidence § 53, at 467 (3d ed. 1940). See supra at 470–471 where

Wigmore said that courts frequently failed to distinguish this use of the deceased's character from

the use of *communicated character* for violence to show the *reasonableness of the defendant's apprehension* of violence. * * * In the present use, this additional element of communication is unnecessary; for the question is what the deceased probably did, not what the defendant probably thought the deceased was going to do.
McCormick, op. cit. supra note 22, § 160, at 339–340.

35. See id. n. 1, at 676–677.

36. See ibid.

with, and in so doing may interrogate the witness by leading questions.

██ One of the appellant's specifications of error in relation to his cross-examination of Officer Hume is that the court erroneously sustained "appellee's objection to appellant's question of the witness Hume as to what Mr. Jenkins told him about who approached whom as the appellant was leaving the vessel immediately prior to the shooting." Appellant has not indicated the basis for the admissibility of such testimony. We hold that the trial court correctly sustained the state's hearsay objection to this question.[37]

During his direct examination Jack Jenkins was asked as to how long an interval there was between the last conversation between Tiny and appellant and the time when the shot was fired. Jenkins then replied, "A few seconds * * * just a very few, less than 10 seconds I would think." The prosecution then obtained Jenkins' admission that at the preliminary hearing he had testified that interval was "less than a minute"; that he had also told a state trooper that the time involved was "approximately 45 seconds"; that he had told Officers Penman and Hume on the night of May 23 that the length of time was "30 seconds." Jenkins concluded his direct on this point by observing "It seemed like a shorter period as I try to recall it." On cross-examination Jenkins admitted that he had given the authorities at least three different time estimates, and that he was not positive as to how much time had elapsed between decedent's last remark and the shot.

In the course of cross-examination Officer Hume was asked what reference Jenkins had made in his first statement to the police concerning this time interval. The trial court sustained the state's objection, commenting "It's a question that should be properly asked to Mr. Jenkins." To a following question Officer Hume testified that the time interval related by Jenkins varied throughout these different interviews. The witnesses admitted that one of the objects of the interviews of Jenkins was to explore the time interval in question, and that at each interrogation Jenkins was asked several times about this subject. The appellant was also precluded from asking Officer Hume whether Jenkins mentioned the time interval during these various questionings, and whether in fact the interval lengthened with each succeeding interrogation.

██ In view of the testimony elicited from Jenkins on both cross-examination and direct examination, and upon consideration of Officer Hume's testimony to which we have referred, we are of the opinion that no error resulted from the trial judge's questioned rulings.[38] Jenkins' uncertainty as to the precise duration of the time interval was readily apparent to the jury. The jury was also fully aware of the different estimates he had given and of his own conclusion that the interval seemed to shorten when he attempted to recall its duration. The trial judge is vested with wide discretion in controlling the order of proof, examination of witnesses, and the

---

37. Note appellant did not previously lay a foundation in his cross-examination of Jenkins, under Civ.R. 43(g) (11) [c] for impeachment of Jenkins through Officer Hume's testimony.

38. We are also influenced by the fact that the record discloses appellant had in his possession copies of all statements of Jenkins prior to his cross-examination of Jenkins; that no attempt was made by appellant to lay a Civ.R. 43(g) (11)

[c] foundation for impeachment as to these time interval statements during appellant's cross-examination of Jenkins; and that the trial court advised counsel that he could call Jenkins in the defense's case and ask these questions of him.

Crim.R. 47(a) provides:

Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

scope of cross-examination. Under the circumstances of this record, we are not persuaded that the trial court abused its discretion or that such rulings were prejudicial.[39]

Appellant's final point is that it was error to preclude questions concerning statements he had made as to his state of mind. The trial court sustained an objection to questions of Officer Hume as to what appellant had said about his own frame of mind, and also to what Jack Jenkins had told Officer Hume appellant had said about his state of mind. We are of the opinion that no error was committed here by the trial court. In addition to appellant's own detailed testimony on this subject, the jury heard Jenkins' testimony to the effect that every one was under a strain due to arguments; that appellant was nervous (had diarrhea), and tense; Nairin and Roberts recounted their observation of frequent arguments between deceased and appellant; the jury had Officer Hume's testimony that appellant had told him "he couldn't take it any more"; Officer Penman related that appellant told him he had had it, that he couldn't sleep, that the strain had made him ill; Officer Penman also told the jury that appellant said, "Christ yes * * * Christ yes I was afraid." [40]

We need not decide the question of whether appellant's self-serving declarations as to his state of mind, as related to Officer Hume, were admissible for we are convinced that any error in the exclusion of such testimony was harmless error.[41]

Affirmed.

39. See McCormick, op. cit. supra note 22, §§ 21-22, at 43-52, for an excellent discussion on the various rules concerning the proper scope of cross-examination. Our ruling here is also dispositive of appellant's assertion of error in regard to his cross-examination of Officer Oehler. We find no error in regard to this specification of error.

40. Officer Penman also recounted the threats Tiny had made as related to him by appellant.

41. Compare 6 Wigmore, Evidence § 1732 (4) (3 ed. 1940) and McCormick, op. cit. supra note 22, § 275, with 1 Wharton Criminal Evidence § 285 (12th ed. 1955) and 2 Warren, Homicide § 215, at 646, 652-53 (1939).