Ute PRIEST and David Priest,
Appellants,

v.

Edwin LINDIG, Jr., M.D., Appellee.

No. 3016.

Supreme Court of Alaska.

July 14, 1978.

Lawrence J. Kulik and Lester W. Miller, Anchorage, for appellants.

Marcus R. Clapp, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, BURKE and MATTHEWS, JJ.

RABINOWITZ, Justice.

Appellants Ute and David Priest brought suit against appellee Dr. Edwin Lindig for medical malpractice. After trial by jury, a verdict was returned in favor of Dr. Lindig. Judgment was entered on the verdict and this appeal followed.

Appellant Ute Priest asserted that a chronic osteomyelitis condition in her lower left leg was caused by Dr. Lindig's failure timely to diagnose or detect a developing wound infection which occurred subsequent to Dr. Lindig's open reduction of a fracture on her left distal tibia.[1] Appellant advanced the further claim that after Dr. Lindig had notice of the wound infection he failed to treat the condition properly.[2] Dr. Lindig's position was that there were insufficient indicia and symptoms present to give notice of any infection in the area of the wound. Appellee further contended that after he had sufficient reason to suspect infection had developed, his treatment thereafter was non-negligent.

In their first specification of error, the Priests contend the superior court erroneously ruled that AS 09.55.540 articulates the standard of care applicable to nationally board certified medical specialists practicing in the State of Alaska.

At the time trial was held in this matter, AS 09.55.540 read:

*Burden of Proof.* (a) In a malpractice action based on the negligence of a physician . . . , the plaintiff shall have the burden of proving

(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . practicing the same specialty in similar communities to that in which the defendant practices;

(2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

(b) In the malpractice actions there shall be no presumption of negligence on the part of the defendant.[3]

---

1. Ute Priest slipped on an icy sidewalk in Fairbanks and fell to the pavement, fracturing the distal end of her left tibia.

2. No dispute appears in the record as to the fact that Ute Priest's surgical wound did become infected or as to the further fact that this infection resulted in appellant's chronic osteomyelitis condition.

3. By enacting § 34, ch. 102, 1976 Alaska Session Laws, the legislature amended the introductory paragraph of AS 09.55.540(a) as well as paragraph (1) of subsection (a) and changed the tense of subsection (b). The effective date

AS 09.55.550 further at that time provided that "[i]n medical malpractice actions the jury shall be instructed that the plaintiff has the 'burden of proving, by a preponderance of the evidence, the negligence of the physician . . . ."[4] The superior court instructed the jury by setting forth the text of AS 09.55.540(a) and (b). Additionally, the superior court, in the same instruction, informed the jury that "the Defendant cannot be held to answer in damages to the Plaintiff unless you find that Plaintiff has totally complied with these provisions." The superior court further instructed:

> The Defendant orthopedic surgeon was under a duty to use reasonable care in the treatment to be rendered the Plaintiff Ute Priest. Reasonable care means that degree of care and skill normally possessed and exercised by physicians of the same specialty practicing in Fairbanks, Alaska, or in similar communities.

Arguing that AS 09.55.540 does not establish a standard of care, the Priests contend: the sole intent of the legislature in enacting AS 09.55.540 was to preclude the application of the doctrine of res ipsa loquitur to medical malpractice cases; the legis-

lature merely intended the statute to allocate a burden of proof; and this court should hold that a national standard of care applies to Dr. Lindig so that his performance will be measured against the standard of care of those physicians practicing Dr. Lindig's specialty without regard to the community in which he or they practice.[5]

In *Poulin v. Zartman*, 542 P.2d 251 (Alaska 1975), we considered whether AS 09.55.-540 precludes this court from adopting a national standard of care as to board certified medical specialists. Justice Connor, writing for the majority, concluded that the arguments in favor of a national, nongeographically oriented standard of care are strong, but held that since "[t]he language of AS 09.55.540 is so clear and unambiguous . . . we are foreclosed from broadening the standard contained therein through judicial construction."[6]

While the relevant legislative committee report demonstrates that the legislature was primarily concerned with avoiding increases in malpractice insurance rates, which application of the doctrine of res ipsa loquitur was said to produce,[7] we think it

---

of these amendments, May 29, 1976, was subsequent to the time of trial in the instant case.

4. AS 09.55.550 additionally provided: "The jury shall be further instructed that injury alone does not raise a presumption of the physician's . . . negligence."

This statute was also amended by § 34, ch. 102, 1976 Alaska Session Laws; so, at present, AS 09.55.550 reads:

*Jury Instructions.* In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving the health care provider's negligence or wilful misconduct in accordance with the standard of proof specified in § 540 of this chapter. The jury shall be further instructed that injury alone does not raise a presumption of the health care provider's negligence or misconduct.

5. At the close of trial, appellants did not offer alternative jury instructions because the court had indicated it would not use them and that appellants had an exception to this ruling. Accordingly, while exceptions, as such, are no longer required under Civil Rule 46(f), it is clear that appellants reserved their right to appeal as to this issue. *See Spruce Equip. Co. v. Maloney,* 527 P.2d 1295, 1301 (Alaska 1974).

During the course of the trial, appellants submitted a written jury instruction which would require "due care on the part of a physician of the same school at the same time under the same or similar circumstances." Appellants later orally offered to submit jury instructions addressing a *national* standard of care and "special skills" but this request was denied.

6. *Poulin v. Zartman,* 542 P.2d 251, 270 (Alaska 1970). Justice Rabinowitz dissented from the majority's construction of AS 09.55.540(a) on the ground that the relevant committee report did not mention a standard of care and referred extensively to the need to modify the law with respect to the burden of proof in medical malpractice actions. The dissent advanced the argument that AS 09.55.540 did not embody any standard of care, or at best, only set forth a minimum standard. *Id.* at 276–77.

7. The legislative committee report states:

*House Judiciary Committee Report on COMMITTEE SUBSTITUTE FOR SENATE BILL NO. 142 amended*

This bill attempts to codify the law with respect to the burden of proof in medical and dental malpractice actions and counter the 1964 case of *Patrick v. Sedwick,* Alaska, 391

manifest that in the course of nullifying the doctrine's effect, the legislature adopted the "same or similar communities" test. Dr. Lindig's rejoinder—that AS 09.55.540 can only be construed as setting forth a standard of care applicable to all medical malpractice cases in Alaska—appears correct. As appellee notes, an anomalous result would ensue if this court were to adopt a national standard of care in light of a statute which defines the plaintiff's burden of proof in terms of the standards of communities similar to that of the defendant physician.[8] Thus, we adhere to *Poulin v. Zartman, supra,* and reiterate our holding that AS 09.55.540, by its terms, embodies a standard of care, and we therefore conclude that the superior court did not err in instructing the jury in accordance with AS 09.55.540.[9]

In reality, the conflict between national and local standards is largely illusory in this case. Although different treatment methods were expressed by the various medical experts who testified, none of those methods were said to be geographically oriented. This is not a case where the absence of specialized medical facilities or techniques was relevant and the general methods of diagnosis and treatment of the injury in question would not be different in Fairbanks, Alaska, than in a large metropolitan center. Therefore, it cannot be concluded that the "similar communities" instruction conveyed a standard of conduct more lenient than a national standard instruction.

Despite the foregoing, we are aware that some courts are now rejecting the similar communities test[10] and are adopting the

P.2d 453, the effect of which is said to be an intolerable rule of law resulting in astronomically high malpractice insurance rates. Basically the bill requires that, in these actions, negligence be proved and not presumed.

/s/ Tom Fink
Tom Fink, Chairman

Appellants also note that AS 09.55.550, which was enacted simultaneously with AS 09.55.540 and which concerns jury instructions, does not refer to the "same or similar" locality standard. That version of AS 09.55.550 applicable to this case stated:

*Jury Instructions.* In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of evidence, the negligence of the physician or dentist. The jury shall be further instructed that injury alone does not raise a presumption of the physician's or dentist's negligence.

8. Dr. Lindig also argues that if AS 09.55.540 is construed as only precluding the applicability of the doctrine of res ipsa loquitur to medical malpractice cases, then AS 09.55.540(b) is all that would be required, and AS 09.55.540(a) becomes surplusage against the rule of construction that "each section of a statute is presumed to serve some useful purpose." *Isakson v. Rickey,* 550 P.2d 359, 364 (Alaska 1976).

9. For cases applying the similar communities test, see Annot., 37 A.L.R.3d 420 (1971). *See also* McCord, *The Care Required of Medical Practitioners,* 12 Vand.L.Rev. 549 (1959); Note, *Medical Specialties And The Locality Rule,* 15 Stan.L.Rev. 884 (1962).

10. Even where the courts have not repudiated the similar communities test in so many words,

they have tended to change the definition of "similarity" to one which increases the focus on medical variables which might impinge upon the defendant physicians capacity to provide services. Descriptions of this trend, and of the increased standardization of training and access to medical facilities, can be found in *Robbins v. Footer,* 179 U.S.App.D.C. 389, 394–95, 553 F.2d 123, 128–29 (1977); *Shilkret v. Annapolis Emergency Hosp. Ass'n,* 276 Md. 187, 349 A.2d 245 (1975). *See* Note, *Medical Specialties and the Locality Rule,* 14 Stan.L. Rev. 884 (1972); Lawyer's Medical Cyclopedia (Revised ed. 1966), § 2.45, at 120–24.

One standard which has been applied is geographic proximity between communities, which retains much of the 'same' locality flavor. Other courts have considered socioeconomic factors such as population, type of economy, size of city, and income of inhabitants. Most courts applying this standard, however, have adopted the view that 'similar' locality should be defined in terms of medical factors such as the existence of research and laboratory facilities, medical schools, teaching hospitals and modern equipment in the localities to be compared. The commentators agree that this is the most logical application of the rule when measured against a major reason for its adoption—the availability of resources which will enable the physician to maintain the standard of his practice. *See generally* Note, 40 Fordham L.Rev. 435, 549 (1971); Note, *Medical Malpractice-Expert Testimony,* 60 Nw.U.L.Rev. 834, 838 (1966); Note, *Medical Specialties And The Locality Rule,* 14 Stan.L.Rev. 884, 890 (1962). *Shilkret v. Annapolis Emer. Hosp. Ass'n,* 276 Md. 187, 349 A.2d 245, 250 n. 5 (1975).

rule that all physicians in their states must "use that degree of care and skill which is expected of a reasonably competent practitioner in the same class (*i. e.*, general practitioners or specialists) to which he belongs acting in the same or similar circumstances." [11] Other courts, while declining to abandon the similar communities test with respect to general practitioners, have emphasized the similarity of training for certified specialists as well as the fact that even within the framework of the locality rules, physicians holding themselves out to the public as specialists are held to higher standards than general practitioners and these courts have adopted a "pure" national test as to specialists. [12] These trends appear to have influenced the Alaska legislature, for in a comprehensive act relating to health care, effective May 29, 1976, it amended AS 09.55.540(a)(1) requiring the plaintiff to prove "the degree of knowledge or skill possessed, or the degree of care ordinarily exercised *under the circumstances*, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing . . ." [13] (emphasis added)

Appellants argue alternatively that in the event this court does not adopt a national standard of care, we should embrace as the appropriate standard of care the following criteria found in a jury instruction which was offered by the appellant in *Poulin v. Zartman*, 542 P.2d 251, 269 n. 42 (Alaska 1975):

A physician may be possessed with a greater degree of skill, knowledge or intelligence than other physicians practicing in the same specialty in similar communities. In such a case the physician is required to use whatever superior knowledge, skill and intelligence he has and the

In *Gambill v. Stroud*, 531 S.W.2d 945, 948 (Ark.1976), the court stated:

The similarity of communities should depend not on population or area in a medical malpractice case, but rather upon their similarity from the standpoint of medical facilities, practices and advantages.

See also *Cavallaro v. Sharp*, 84 R.I. 67, 121 A.2d 669, 672–73 (1956).

We generally approve of the approach adopted by these authorities and think that it is consistent with AS 09.55.540(a). Appropriate instructions defining "similar communities" in terms of medical similarities may be given.

**11.** *Shilkret v. Annapolis Emerg. Hosp. Ass'n*, 276 Md. 187, 349 A.2d 245, 253 (1975).

[A] physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances. Under this standard, advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account.

Similar or identical rules have been adopted in at least the following cases: *Landeros v. Flood*, 17 Cal.3d 399, 131 Cal.Rptr. 69, 72–73, 551 P.2d 389, 392–93 (1976); *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky.1970); *Pederson v. Dumouchel*, 72 Wash.2d 73, 431 P.2d 973, 976–78 (1967) (the Washington court uses the word "average" instead of "reasonably competent"); *Shier v. Freedman*, 58 Wis.2d 269, 206 N.W.2d

166, 174 (1973) (geographical area and its attendant lack of facilities are circumstances that can be considered if appropriate). As the Kentucky and Maryland courts noted, use of the term "average" causes one-half the physicians to be defined as negligent. *See* Restatement (Second) of Torts § 299A (1965) comment *e*. The court in *Pederson* added:

This standard of care is that established in an area coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the patient.

431 P.2d at 978.

**12.** *Naccarato v. Grob*, 384 Mich. 248, 180 N.W.2d 788, 791 (1970):

The reliance of the public upon the skills of a specialist and the wealth and sources of his knowledge are not limited to the geographic area in which he practices. Rather his knowledge is a specialty. He specializes so that he may keep abreast. Any [non-national] standard for a specialist would negate the fundamental expectations and purpose of a specialty.

*Accord, Kronke v. Danielson*, 108 Ariz. 400, 499 P.2d 156, 159 (1972); *Christy v. Saliterman*, 288 Minn. 144, 179 N.W.2d 288, 302 (1970).

**13.** This amendment was made expressly applicable to claims for relief which had not been filed before the effective date of the act. Sec. 47, ch. 102, 1976 Alaska Session Laws.

failure to do so will render him liable for injury to the patient.[14]

We find it unnecessary to pass upon appellants' alternative argument given the factual context of this record. For here it did not show that appellee possessed any greater degree of knowledge or skill in the detection and treatment of infected surgical wounds than other physicians practicing in the same specialty in similar communities.

The Priests next contend that the superior court committed reversible error by applying AS 09.55.540 to exclude certain offered opinion testimony of Dr. Robert N. Rabkin. As indicated previously, appellants had advanced two theories upon which they claimed Dr. Lindig was negligent. One was that Dr. Lindig negligently failed to diagnose or detect in a timely manner an infection which occurred subsequent to Dr. Lindig's open reduction of the fracture of Ute Priest's left distal tibia. In appellants' view, the excluded testimony of Dr. Rabkin was relevant to the establishment of this theory of liability.

The record, in part, shows that Ute Priest slipped and fractured the distal end of her left tibia on March 23, 1971. Thereafter, she was hospitalized and an open reduction performed upon Mrs. Priest's fractured tibia on March 25, 1971. Mrs. Priest was subsequently discharged from the hospital on April 3, 1971. Study of the testimony of Dr. Rabkin shows that his testimony related primarily to the periods of time Ute Priest was hospitalized, i. e., from March 25, 1971

to April 3, 1971, and to the occasions that Ute Priest was seen by Dr. Lindig at his clinic commencing on April 5, 1971, through April 8, 1971.[15] Dr. Rabkin's testimony, which was based on events that occurred during the aforementioned times, was offered for the purpose of showing that during these periods Dr. Lindig was negligent in his failure to detect that infection had developed in the area of the surgical wound in Ute Priest's leg.

Concerning Dr. Rabkin's qualifications pertaining to the diagnosis and detection of post-operative infections in surgical wounds, the following was established: Dr. Rabkin graduated from Albany Medical College and underwent an internship at Stanford University Hospital in Palo Alto, California. At the latter institution, he completed his training as a specialist in general surgery and thereafter was certified by the American Board of Surgery as a general surgeon. Dr. Rabkin testified that during the course of his training he received a great deal of exposure to orthopedic surgery and he estimated that he had assisted in more than 100 orthopedic surgical operations since receiving board certification in 1965. The witness further testified that he has performed several thousand surgical operations and observed the wounds necessarily created in the course of such procedures.[16]

On the basis of his examination and study of the hospital and clinical records pertain-

---

14. Dean Prosser provides support for appellant's jury instruction:

> [I]f [an individual] has in fact knowledge, skill, or even intelligence superior to that of the ordinary man, the law will demand of him conduct consistent with it. . . . [A] physician who is possessed of unusual skill or knowledge must use care which is reasonable in light of his special abilities and information and may be negligent where an ordinary doctor would not.

W. Prosser, Handbook of the Law of Torts § 32, at 161 (4th ed. 1971). He adds that "the care required is still only the ordinary care of a reasonable man, assuming that he has such knowledge." Id., § 32, at 161 n. 30. See also Restatement of Torts (Second) § 289, comment m.

15. Appellants note in their brief that they "explicitly pointed out that Dr. Rabkin had no opinion concerning whether Dr. Lindig's treatment of Judy Priest was proper once, by approximately April 8, 1977, Dr. Lindig had examined the patient's operative wound and was aware of a wound infection." Ute Priest's leg was placed in a cast subsequent to the operation. On April 8, 1977, Dr. Lindig windowed the cast and detected the infection.

16. Dr. Rabkin testified that he held the position of Chief of Surgery at Alameda Hospital, Alameda County, California; that the Department of Surgery included orthopedic and general surgeons; and that because common themes run through surgery, a general surgeon could be the head of a department which included orthopedic surgeons.

ing to Ute Priest for the periods March 25, 1971, to April 3, 1971, and April 5, 1971, through April 8, 1971, appellants offered Dr. Rabkin's opinion that Ute Priest was undergoing abnormal pain and was receiving "inordinately" high dosages of narcotic analgesic. As noted previously, this offer went to the alleged negligence of Dr. Lindig in failing to detect or diagnose in a timely fashion the wound infection during the course of Ute Priest's post-operative care. The superior court sustained appellee's objections to this aspect of Dr. Rabkin's testimony.[17]

We have held that a trial court's rulings concerning the admissibility of evidence will be disturbed only in those instances where we are convinced that the broad discretion vested in the trial court in such matters has been abused. *Lewis v. State*, 469 P.2d 689, 695 (Alaska 1970). Similarly, we have stated that trial courts are permitted wide discretion in determining whether to qualify witnesses as expert witnesses and that such determinations will be disturbed only if the complaining party demonstrates an abuse of discretion. *Ferrell v. Baxter*, 484 P.2d 250, 267 (Alaska 1971).[18]

■ Given Dr. Rabkin's extensive educational background and experience in surgery, his significant experience in assisting in orthopedic surgical operation, his observations of numerous surgical wound infections and his involvement in the treatment of patients who had open reduction surgical wounds, we conclude that the superior court erred in excluding the proffered opinion testimony of Dr. Rabkin. The purpose of the excluded testimony which went to the excessiveness of Ute Priest's post-operative pain, as well as the excessiveness of pain killers which were administered to relieve this condition, was to show that Dr. Lindig was negligent in his failure to diagnose and detect in a timely fashion the presence of infection in Ute Priest's wound in light of these indicia of infection in the wound area. Here the record establishes that there are certain characteristics of surgical wounds common to all types of surgery and that the standard of care on behalf of any type of surgeon in the inspection and detection of post-surgical wound infections cannot, on any rational basis, vary from one part of the country to another. Thus, we conclude that the superior court erred in excluding Dr. Rabkin's testimony.

Appellants assert as an additional specification of error the superior court's exclusion of the entire video tape testimony of Dr. Paul Brown.[19] Dr. Lindig and Dr. Brown first met while undergoing their residency training at Letterman Hospital in San Francisco in the early 1950's. After suit was commenced in the case at bar, Dr. Lindig requested an evaluation of the matter from Dr. Brown. On the basis of the materials that were forwarded to him, Dr. Brown wrote a two page report to appellee's counsel on December 17, 1975. This letter report reads, in part:

> Less defensible, at least academically, is the failure to remove the plaster cast and inspect the extremity and the wound in the face of continued complaints of

17. Counsel for Dr. Lindig objected to the receipt of the questioned opinion testimony from Dr. Rabkin for the reasons that he was not an orthopedic surgeon *and that since the witness was unfamiliar with prevailing medical standards in Fairbanks in 1971, AS 09.55.540 barred any opinion testimony by Dr. Rabkin as to Dr. Lindig's negligence in failing to detect the wound infection earlier.*

18. *See also Crawford v. Rogers*, 406 P.2d 189, 192–93 (Alaska 1965); *Pedersen v. State*, 420 P.2d 327, 335 (Alaska 1966); *City of Fairbanks v. Nesbett*, 432 P.2d 607, 611–12 (Alaska 1967).

 Also of relevance is the fact that the standard of admission of expert testimony is whether the testimony will appreciably assist the trier of fact. *See, e. g., INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 243 (Alaska 1975).

19. Dr. Brown's deposition was taken by video tape in Bridgeport, Connecticut 10 days prior to trial pursuant to superior court order. This video tape deposition was initiated by appellants.

 The record shows that Dr. Brown was chief of surgery at St. Vincent's Hospital in Bridgeport, and he also held the post of assistant professor of orthopedic surgery at the Yale University Medical School. Dr. Brown is interested in the area of orthopedic wound infections and has written numerous articles concerning the subject.

pain. I say academically because the doctor on the spot is the one best qualified to evaluate the patient's pain, which after all is a subjective response to many factors, not the least of which is the patient's personality. Dr. Lindig is a keen observer and has great experience in these matters, but I nevertheless believe that continually or progressively painful operated areas must be inspected. I do not agree with the statements made about windowing the cast: though time-honored, it's potentially dangerous and in my opinion only adds to problems of swelling and local edema. Further, if the internal fixation of this admittedly severely unstable fracture was adequate, then a change of plaster cast would not have endangered the retention of reduction.[20]

During the course of his video tape deposition,[21] Dr. Brown indicated that he had modified the position he took in his letter of December 17, 1975, because he had subsequently reviewed the pre-operative x-rays [22] and further because the location of an abrasion in relation to the surgical wound was recently clarified for him. After changing the basis for its exclusion of the video tape

of Dr. Brown,[23] the superior court ruled that it would exclude the entire video tape testimony of Dr. Brown because counsel for appellants had not complied with Civil Rule 43(g)(11)(c) [24] in his attempt to impeach Dr. Brown with the December 17, 1975, report, in that the deposition would not be useful for its intended purpose, i. e., impeachment, and that admission of the deposition would likely confuse the jury.

 We think the superior court erroneously excluded the deposition testimony of Dr. Brown. First, the record demonstrates that counsel for appellants did comply with the requirements of Civil Rule 43(g)(11)(c) [25] in his attempt to impeach the witness.[26] Secondly, it is clear that the letter report of December 17, 1975, had considerable significance to appellants' attempt to prove negligence.[27] We think Dr. Brown's explanation of the reasons why he modified the position he took in the December 17, 1975, letter goes to the weight rather than the admissibility of the letter. What weight should be accorded the report in light of Dr. Brown's subsequent modification of opinion, and the reason therefor, was peculiarly within the province of the jury.[28] Nor do we believe that potential

**20.** The December 17, 1975, letter of Dr. Brown also contained the following paragraph:

> I concur with Dr. Grant's statements regarding the advisability for wound debridement, irrigation and intravenous antibiotics once the infection was detected, but of course the success of such treatment is proportionately contingent upon early discovery of the infection. In fact, I found Dr. Grant's evaluation of the entire case to be thorough, objective and reasonable though I would argue about a few details of techniques such as windowing the cast.

**21.** See note 18, supra.

**22.** Dr. Brown had reviewed, prior to authoring the December 17, 1975, letter, the reports of the radiologist in Fairbanks who had reviewed the pre-operative x-rays.

**23.** See note 29, infra.

**24.** Civil Rule 43(g)(11)(c) provides:

> Prior Inconsistent Statements. A witness may be impeached by evidence that he has made at other times statements inconsistent with his present testimony. The statements must first be related to him, with the circum-

stances of times, places, and persons present, and the witness shall be asked whether he had made such statements and, if so, shall be allowed to explain them. If the statements are in writing, they shall be shown to the witness before he is asked any question concerning them.

**25.** Id.

**26.** We have previously held that a party may impeach his own witness through prior inconsistent statements and that the impeaching evidence may be received as substantive evidence of the subject matter to which it pertains. Eubanks v. State, 516 P.2d 726, 728, 729 n. 6 (Alaska 1973); Beavers v. State, 492 P.2d 88, 91, 94 (Alaska 1971).

**27.** The substance of the letter report of Dr. Brown lends support to Dr. Grant, the only witness whose favorable testimony was received in evidence in behalf of appellants.

**28.** Cf. George v. Morgan Constr. Co., 389 F.Supp. 253, 261–62 (E.D.Pa.1975) (contradiction by other experts went to weight not admissibility); Hagler v. Gilliland, 292 Ala. 262, 292

jury confusion was a valid basis for the exclusion of the witness' deposition. Study of the deposition in light of the other evidence which was presented at trial leaves us unpersuaded that its introduction had the likelihood of confusing the juror's understanding of the issues in the case.[29]

We thus conclude that a new trial should be held in this matter because we cannot say with a fair degree of assurance that the jury's substantive deliberation would not have been appreciably affected by virtue of the superior court's erroneous rulings concerning the testimony of Dr. Rabkin and Dr. Brown.[30] *Love v. State*, 457 P.2d 622, 631 (Alaska 1969).

Reversed and remanded for a new trial.

CONNOR, J., not participating.

So.2d 647, 649 (1974) (differences in testimony of experts goes to weight of evidence rather than admissibility); *Brookhaven Supply Co. v. DeKalb County*, 134 Ga.App. 878, 216 S.E.2d 694, 695 (Ga.App.1975) (matters omitted from consideration by expert are proper for cross-examination and rebuttal and go to weight given opinion by jury); *Johnson v. Malnati*, 110 N.J.Super. 277, 265 A.2d 394, 396 (1970) (party against whom an admission is shown may introduce evidence to explain the statement and thus diminish its weight as evidence); *McGlothin v. State Highway Comm'r*, 213 Va. 734, 196 S.E.2d 80, 81 (1973) (error to refuse to allow expert testimony as to appraisal made later than point in question when date could have been shown as affecting weight of this opinion evidence).

**29.** Appellees additionally contend that the superior court's ruling was supported by the fact that Dr. Brown did not assert any knowledge of Fairbanks standards. The superior court had earlier held that the deposition should be excluded on these grounds. The court, on reconsideration, held that it was not basing its ruling on this ground and that the court concluded that Dr. Brown established a basis for knowledge of local practice that was sufficient. In our review of the record, we find nothing to show that this ruling was clearly erroneous.

**30.** Our resolution of the foregoing issues has made it unnecessary to treat any other issues raised in this appeal.