MORGAN (NOW EVELYN F. WORST), EXECUTRIX OF THE ESTATE OF HAROLD W. MORGAN, PLAINTIFF-APPELLEE, *v.* SHEPPARD, DEFENDANT-APPELLANT.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 26076.   Decided March 7, 1963.

580

*Messrs. McNeal & Schick,* for plaintiff-appellee.
*Messrs. Chastang & Carroll* and *Messrs. Metzenbaum, Gaines, Schwartz, Krupansky & Stern,* for defendant-appellant.

CORRIGAN, J.  This cause is before the court on an appeal on questions of law from a jury verdict and judgment entered thereon in the Common Pleas Court of Cuyahoga County in the amount of $50,000.00 against a defendant, Dr. Stephen A. Sheppard, for wrongful death in a malpractice action.  The plaintiff's case went to the jury against Dr. Stephen A. Sheppard and two other defendants, Dr. Richard N. Sheppard and Bay View

Hospital (Cleveland Osteopathic Hospital), and the verdict of the jury was in favor of each of the other two defendants.

A companion case for pain and suffering of the plaintiff's decedent was tried at the same time against the same three defendants and resulted in verdicts for all defendants.

It seems advisable to set out at some length excerpts from the evidence that was before the jury as reflected by the voluminous record of 2260 pages and numerous exhibits. On June 12, 1956, plaintiff's decedent, Harold W. Morgan, a 40 year old male, married, with three children, consulted Dr. Urwin W. Hampton, an osteopath, at the latter's office in Berea, Ohio. Mr. Morgan complained of pain in his right mid chest and under the right lower ribs and further complained of trouble with his stomach for three or four years. Mr. Morgan stated to Dr. Hampton that three years before he had X-rays taken at Southwest Community Hospital in Berea, with diagnosis of an ulcer and was treated as an ulcer patient and that he got better; that the present pain did not seem the same and that it was not relieved by milk or food; that the pain was light and dull in nature and had lasted constantly for the past ten days; that he had trouble with greasy-food digestion; and that he had bowel trouble all of his life, but that he did not take cathartics regularly.

The hospital records of plaintiff's decedent covering this earlier treatment at Southwest Community Hospital in Berea (plaintiff's Exhibit 6 and defendant's Exhibit A), show that he was admitted to that institution on May 7, 1953, at 5:12 P. M. and discharged on May 8, 1953, at 11:00 A. M. Dr. Kechele was the attending physician. The diagnosis after X-rays were taken was that plaintiff's decedent had a duodenal ulcer and conservative therapy was ordered.

Dr. Hampton did not check this hospital record in Berea. He gave Mr. Morgan advice and manipulative treatment to the tense and painful areas on the supposition that the pain was not the same pain that he had experienced before when he was an ulcer patient. He did not have X-rays taken. Dr. Hampton did not prescribe any definite medication for Mr. Morgan but asked him to retain the same type of diet and medication that he used when he was under treatment for the ulcer to see whether

it would give him relief. Dr. Hampton did not know what was causing the pain, and he did not ascertain what medication Mr. Morgan had been on when he had had the ulcer in 1953. Mr. Morgan next consulted Dr. Hampton on June 28, 1956, and was again given manipulative treatment. The next visit was on July 5, 1956, and Dr. Hampton gave him no treatment at that time but noted that he was no better and told Mr. Morgan to go to a specialist for further evaluation and study. He suggested that Mr. Morgan go to any specialist he wished, but to go to Bay View Hospital for X-rays, that he would be admitted there under the supervision of Dr. Stephen Sheppard, and that Dr. Stephen Sheppard would handle the case on his referral. Dr. Hampton called Dr. Stephen Sheppard and told him that Mr. Morgan would be going to Bay View Hospital. Dr. Stephen Sheppard is an osteopathic physican and surgeon.

The Bay View Hospital record indicates that Mr. Morgan was admitted there on July 5, 1956, at 2:00 P. M. The admitting diagnosis was "peptic ulcer—prob. Duodenal cap." A "G. I. series" of X-rays was ordered and taken by Dr. G. C. Flick of the Bay View Hospital staff, and his X-ray report, dated July 6, 1956, states in part:

"*Nine Post Prandial Films* show a deformity of the second portion of the duodenum superiorly which represents either an adhesion or diverticulum."

On July 7, 1956, the X-rays were reviewed by Dr. W. B. Selnick of the Bay View Hospital staff, and his opinion as noted in Physicians Findings and Progress Notes of the Bay View Hospital record was:

"1. Diverticulum or adhesive pull on duodenum."

Dr. Stephen Sheppard talked with Dr. Hampton on the third or fourth day after Mr. Morgan had been admitted to the hospital and told him that they had evaluated a diagnosis to a certain point and that there was an ulcer of the duodenum. The diagnostic studies of Mr. Morgan were made by Dr. Stephen Sheppard. Dr. Stephen Sheppard saw Mr. Morgan on July 9, 1956, at 10.00 A. M. At that time, Dr. Stephen Sheppard reviewed the X-rays and discussed the case with Mr. Morgan. He also conferred with Dr. Richard N. Sheppard and with the radiologist. The radiologist did not use the word "ulcer" any-

where in interpreting the X-rays, and Dr. Stephen Sheppard disagreed with the findings of the radiologist that the X-rays indicated a diverticulum or adhesions and was of the opinion that Mr. Morgan had a penetrating duodenal ulcer. Dr. Stephen Sheppard recommended that a partial gastrectomy be performed. Mr. Morgan was advised that Dr. Richard Sheppard would do the surgery since he was doing more of that kind of work. However, Dr. Stephen Sheppard had written most of the pre-operative orders.

The operation, a partial gastrectomy and jejunostomy, was performed on July 10, 1956, at 1:00 P. M. by Dr. Richard Sheppard, and the duodenal stump was permitted to remain. Dr. Richard Sheppard estimated that he removed fifty to sixty per cent of the stomach but that he did not remove all of the acid-secreting portion, although enough was removed to reduce the acid fifty per cent. At 8:30 P. M., a Levin tube was inserted through the nose to drain the stomach. The portion of the stomach removed by Dr. Richard Sheppard was sent for a pathological test and no evidence of an ulcer was found. The laboratory report from the Department of Pathology of Bay View Hospital, dated July 14, 1956, reads:

"Gross Specimen consisted of a section of stomach which measured 9x9x3 cm. and showed some degeneration in the lower portion. No definite ulcer was noted.

"Microscopic: This section of stomach tissue showed albuminous degeneration with swelling of the cells. There was some inflammatory cell infiltration, but no other noteworthy pathological change.

"Diagnosis: Acute gastritis."

On July 11, 1956, the day following the operation, Dr. Richard Sheppard made the following entry in the Physicians Findings and Progress Notes:

"*P. O. diag.* Penetrating duodenal cap ulcer. Partial gastrectomy and gastric jejunostomy done. Pt. cond. good.

R. N. Sheppard D. O."

No tests were performed to determine the acidity of Mr. Morgan's stomach prior to the operation. Dr. Richard Sheppard testified that he and Dr. Stephen Sheppard worked very closely together and that arrangements were made about look-

ing after Mr. Morgan when Dr. Richard Sheppard would be out of the hospital. Mr. Morgan was placed in the care of Dr. Stephen Sheppard after the operation from July 11, 1956, until July 13, 1956, because Dr. Richard Sheppard was in Columbus. Dr. Stephen Sheppard was the medical director of Bay View Hospital, and if he felt that any treatment being given any patient should be changed, he would change it.

Standing orders in Bay View Hospital were that if there was any deterioration in a patient's condition, this deterioration should be reported to the physician in charge of the case at the time. Dr. Stephen Sheppard was available, and had there been any emergency he could have come to attend Mr. Morgan. The hospital record (entry by an intern) indicates that at 4:30 A. M. on July 15, 1956, an emergency existed and that Mr. Morgan was in profound shock. Dr. Stephen Sheppard was notified at that time but did not visit Mr. Morgan until 4:00 P. M. on July 15, 1956. In the opinion of Dr. Stephen Sheppard, Mr. Morgan was hemorrhaging on July 15, 1956.

The Levin tube was clamped off at 2:45 P. M. on July 14, 1956. It was removed at 10:30 or 11:30 P. M. on July 14, 1956. Dr. Stephen Sheppard did nothing about using any other drain or tube to drain any further hemorrhage from the abdominal cavity. On July 11, 1956, Dr. Richard Sheppard had ordered the Levin tube removed on the third day after the operation. Dr. Stephen Sheppard also thought the Levin tube should be removed at that time even though he knew Mr. Morgan had gone into postoperative shock and was in profound shock at 4:30 P. M. on July 15, 1956, after the Levin tube was removed. Examination of the container attached to the Levin tube gave evidence that Mr. Morgan had been hemorrhaging. Dr. Stephen Sheppard did not believe that the abdominal cavity should be drained even though he knew Mr. Morgan had been given medication to combat hemorrhage. He knew that Mr. Morgan was having hallucinations at that time. Moreover, he did not feel it was necessary to take Mr. Morgan to surgery to see if the duodenal stump had ruptured or was leaking even though he had had a hemorrhage the night before. Until 7:30 P. M. on July 15, 1956, Dr. Stephen Sheppard considered himself in charge of Mr. Morgan's case. He was responsible for any care and treatment given Mr. Morgan.

Dr. Richard Sheppard testified that the Levin tube is inserted for drainage and lavage, and that it is important postoperatively that drainage be started as soon as possible and maintained. He testified that if fluid and other material were allowed to remain in the stomach, the stomach would stretch and difficulties would be created at the site of the operation. He also stated that this situation could interfere with the suture line at the duodenal stump and cause leakage and that if there was leakage or a rupture of the suture line, the fluid would flow into the peritoneal cavity. He added that if this occurred, the stomach should be emptied and drained and a re-operation would be necessary, and that if there was a serious leakage peritonitis or paralysis of the intestinal tract would result. Dr. Richard Sheppard testified that he left no orders with anyone to keep him advised about Mr. Morgan's condition.

There were unusual circumstances about Mr. Morgan's progress postoperatively. Mr. Morgan became "shocky" in the evening of July 11, 1956. He was in some respiratory distress, clammy and sweating, and vomited a small amount of blood. Dr. Richard Sheppard did not see Mr. Morgan at that time. Mr. Morgan was placed under an oxygen tent and was put in the Trendelberg position to get blood to his brain. Levophed solution was administered to combat shock and cut down capillary bleeding. The symptoms and signs described along with other symptons could have been of leakage or peritonitis. Dr. Richard Sheppard was advised that there was some difficulty with the drainage tube but that it was corrected. The first time any medication was given to treat a respiratory condition was on July 14, 1956. There was difficulty with the drainage tube on July 13, 1956. The hospital record does not contain any entries of any physician checking the performance of the drainage tube. When the level of Mr. Morgan's blood was checked on July 15, 1956, it was below normal and he was put into shock position, an oxygen tent was provided, and whole blood was to be given. At this time, Dr. Stephen Sheppard was not present and Dr. Richard Sheppard was out of town.

On July 16, 1956, Dr. Martin B. Taliak saw Mr. Morgan at Southwest Community Hospital in Berea where he had been moved by ambulance at the request of his family. He was in a

state of clinical shock, complaining about distress and was in pain. Dr. Taliak testified that seventy-five per cent of the stomach should be removed in operating a duodenal ulcer to prevent it recurring. He also stated that if he had to leave town, he would leave his patient in the hands of his most competent colleague and would see the patient as soon as possible on his return to the city. In addition Dr. Taliak said that he would have hospitalized Mr. Morgan for a minimum of six weeks before doing an operation if he had a penetrating duodenal ulcer.

Dr. Taliak believed that Mr. Morgan had peritonitis. He found there was a collection of escaping fluid in the right upper quadrant of the abdomen and the abdomen was hard. Dr. Taliak concluded that Mr. Morgan had suffered complications of gastric surgery and had a perforated duodenum where it attached to the small bowel. Dr. Taliak also testified that complications following gastric surgery are manifested by pain, vomiting and rise in temperature and that evidence of a tarry stool, elevation in temperature, complaint of discomfort and pain, being clammy and perspiring profusely, are serious signs following surgery. He also stated that if peritonitis is present, suction has to be used to remove the fluid, that if the duodenal stump is leaking or has broken out, an incision to the outside of the abdomen is necessary to remove an accumulation of fluid, and that this operation to remove excess fluid should be done early to prevent peritonitis. Dr. Taliak believed that Mr. Morgan died as a result of the surgery and further complications which created a state of shock from prolonged peritonitis, all resulting from a leaking of the duodenal stump. Dr. Taliak testified that he intended to drain Mr. Morgan's abdomen but since he was dying this was impossible. Dr. Taliak also testified that bleeding from the operation which had been performed should be minimal.

Dr. Kent L. Brown testified that he would have treated Mr. Morgan conservatively for two or three weeks before he would decide to remove a portion of his stomach and that he would have obtained X-rays and made studies to determine the degree of acidity of his stomach. He also stated that it would have been good medical practice in Cleveland in 1955 and 1956 in duodenal ulcer cases to make analyses to determine the gastric acidity of the stomach before an operation and that a large

part of the acid-bearing part of the stomach has to be removed if there is high gastric acidity. In addition, he said that about three-fourths to four-fifths of the stomach should be removed in a duodenal ulcer case; that the more acid that is removed, the less treatment there is later, and that if at least seventy-five per cent of the stomach is removed, a better cure is obtained.

In the opinion of Dr. Brown, the surgery performed on Mr. Morgan was not indicated, and a conservative treatment of two to three days is a short period. It was also his opinion that good medical practice requires conservative treatment for a minimum of two or three weeks with X-rays and other tests.

Dr. Brown could not see any evidence of a perforating duodenal ulcer in the X-rays taken at Bay View Hospital. In his opinion, the X-rays showed an old, healed ulcer which was distorted. He also stated that unless there was enough distortion to cause an obstruction the healed ulcer should have been left alone. In addition, it was his testimony that after an operation an elevation of temperature to 105.2° would be of some concern and that X-rays taken five days after the operation showing an elevation of the diaphragm suggests that something in the abdomen was blowing up the bowel, or exudate or material in the bowel was pushing up or collapsing the base of the lung.

Moreover, Dr. Brown testified that in order to maintain the duodenal stump, a drain can be put in, or the stump can be sewed to the abdominal wall to relieve pressure, that the Levin tube should be inserted into the duodenum, that the placing of the Levin tube in the jejunum would only be useful in compressing the lower bowel, and that the Levin tube keeps fluid out of the stomach and does not increase the pressure in the abdomen.

The autopsy reported indicated that the wall of the duodenum was broken. Dr. Brown testified that if the Levin tube did not operate for three and one-half hours, it would distend the duodenal stump and the patient would complain of pain and discomfort, that there was an accumulation of bloody material in Mr. Morgan's stomach; that if the bleeding did not stop, it would be necessary to open up the area, that when the Levin tube was placed in the jejunum it did not drain the stomach, and that nothing was drained from the duodenal stump.

The Bay View Hospital records indicate that on July 15, 1956, at 4:30 A. M., Mr. Morgan was in shock and was bleeding. Dr. Brown testified that it would have been better to have permitted the Levin tube to remain in Mr. Morgan's body, and that the duodenal stump had distended and apparently ruptured. He also stated that the complaints of Mr. Morgan on July 15, 1956, indicated that there was a rupture of the duodenum and hemorrhage, and that something was going wrong because the Levin tube was not draining properly.

Dr. Brown was also of the opinion that Mr. Morgan suffered perforation of the duodenum with extensive hemorrhage, that this caused his death, and that closer observation of him at an earlier time would have afforded a better chance for his survival.

The hospital record indicated that he needed blood and was in a very bad state. Dr. Brown stated that Mr. Morgan's condition was a catastrophe and that something should have been done for him.

Dr. Walter R. Funk testified that there was no drainage through the Levin tube. He also stated that the low hematocrit of 26 obtained on July 15 indicated that Mr. Morgan had been bleeding, that the blood had not been replaced and that the expelling of a large amount of dark blood and evidence of a tarry stool indicated bleeding from higher up in the gastro intestinal tract.

Dr. Frederick Tillotson performed an autopsy on Mr. Morgan's body. He said that Mr. Morgan's death resulted from the operation (partial gastrectomy and jujunostomy), that there was a leakage of the duodenal stump, that this resulted in an overwhelming diffuse fibrinous peritonitis and fat necrosis, that there was no evidence of any pulmonary embolism, air embolism or fat embolism, and that one of the causes of peritonitis would be a leakage of any part of the intestinal tract into the peritoneal cavity.

The Bay View Hospital record insofar as the nurse's notes are concerned indicates that Dr. Stephen A. Sheppard visited Mr. Morgan on four occasions. Also, Dr. Richard N. Sheppard visited Mr. Morgan on four occasions following the operation. Dr. Stephen Sheppard first saw Mr. Morgan postoperatively at noontime on July 12, 1956. Dr. Richard N. Sheppard first saw Mr. Morgan postoperatively on July 13, 1956, at 10:00 P. M.

In the Progress Notes of the Bay View Hospital record (plaintiff's Exhibit 2) at 1:30 P. M. on July 16, 1956, Dr. Blackwell made an entry, "Patient delirious." The nurse's record of the same exhibit shows that on July 15, 1956, at 3:30 P. M., Mr. Morgan's temperature was 103.6°, that he was having hallucinations, that he heard music coming from the oxygen tent motor, and that at the onset of refrigeration the motor made a tinkling sound which he believed to be a radio station wired into the machine. It also states that at 12:30 P. M. on July 16, 1956, Mr. Morgan was very restless and irrational, that at 2:50 P. M. he was very irrational, and that at 3:50 P. M. he was very incoherent and fighting.

Defendant-appellant, Dr. Stephen Sheppard, assigns as error material and prejudicial to his substantial rights the action of the trial court in overruling his motion for judgment notwithstanding the verdict, which he claims should have been granted for the following reasons:

1. His motion to direct a verdict at the conclusion of plaintiff's evidence and at the conclusion of all the evidence should have been granted, and

2. Upon all the evidence he is entitled to a judgment as a matter of law.

We are unable to agree with defendant-appellant's contention in these respects. A reading of the entire record in the case brings us to the inescapable conclusion that there was sufficient evidence on the issues to submit this case to the jury and the trial court properly did so.

In a malpractice action against a physician involving a claim of negligent treatment with fatal results, it would be reversible error to arrest the evidence from the jury at the close of plaintiff's case in chief and render judgment for defendant physician, where viewing plaintiff's evidence in the light most favorable to her contention she has presented a chain of circumstances and events from which an inference may reasonably arise that the physician was negligent and that such negligence was the proximate cause of such death. See *Hubach* v. *Cole*, 133 Ohio St., 137, 12 N. E. (2d), 283.

Likewise, at the conclusion of all the evidence, on defendant's motion to direct a verdict the court was required to con-

strue the evidence most strongly in favor of the party against whom the motion was made, and if reasonable minds might reasonably reach different conclusions upon any questions of fact, then such questions of fact are for the jury. See *Hamden Lodge et al.* v. *Ohio Fuel Gas Co.*, 127 Ohio St., 469, 191 N. E., 761.

Defendant-appellant, Dr. Stephen Sheppard, further assigns as error prejudicial to his substantial rights the overruling by the trial court of his motion for a new trial which he urges should have been granted for the following reasons:

"1. Error of the trial court in overruling motion of defendant Stephen A. Sheppard to require plaintiff to elect at the close of plaintiff's case, under the doctrine of *respondeat superior*, whether she would proceed against Dr. Richard N. Sheppard as principal or against defendant Stephen A. Sheppard as agent.

"2. Error of the trial court in overruling objections of defendant Stephen A. Sheppard to hypothetical questions submitted to medical witnesses called by plaintiff.

"3. Error of the trial court in refusing to charge the jury on issues of contributory negligence.

"4. Error of the trial court in refusing to give special instructions on questions of law before argument as requested in writing by defendant Stephen A. Sheppard.

"5. Error of the trial court in its general charge to the jury which was excepted to by defendant Stephen A. Sheppard.

"6. Error of the trial court in refusing to submit interrogatories to the jury as requested in writing by defendant Stephen A. Sheppard.

"7. Abuse of discretion of the trial court in requiring the jury, over objection of Stephen A. Sheppard, to deliberate for four (4) days.

"8. The verdict of the jury and the judgment of the Court are not sustained by sufficient evidence and are contrary to law."

The first reason in this second assignment of error cannot be seriously considered by this court in the light of all of the evidence in the case. The patient was referred to Dr. Stephen Sheppard by another osteopath. Dr. Stephen Sheppard called in his brother, Dr. Richard Sheppard, and together, on July 5, 1956, they examined Mr. Morgan and agreed on a diagnosis that

the patient should have an operation to remove what they diagnosed as a penetrating duodenal ulcer.

Plaintiff alleges in her second amended petition, in part, that the defendant doctors were negligent in diagnosing the case, were negligent in performing the operation, were negligent in not adequately following and observing plaintiff's decedent postoperatively, were negligent in not giving necessary postoperative orders, and were not available on call to take care of the complications which followed the operation.

In his answer to plaintiff's petition, Dr. Stephen Sheppard says:

"* * * that during the time Harold W. Morgan was hospitalized as a bed-patient at the Cleveland Osteopathic Hospital he attended and treated said Harold W. Morgan."

Dr. Richard Sheppard, in his answer, states:

"Further answering, defendant, Dr. Richard N. Sheppard, states that during the time Harold W. Morgan was hospitalized as a bed-patient at the Cleveland Osteopathic Hospital he acted as consultant on the case at the request of Dr. Stephen A. Sheppard and performed surgery on said Harold W. Morgan."

Without question, from the evidence and the admissions in the pleadings, Dr. Stephen Sheppard was the doctor in general charge of Mr. Morgan's case. We do not find this reason to be well taken.

On the second reason in support of defendant-appellant's second assignment of error, we find nothing erroneous in the rulings of the trial court in connection with the hypothetical questions asked.

With regard to the third reason, we are of the opinion that the trial judge correctly refused to submit the issue of contributory negligence to the jury. A careful reading of the Bay View Hospital record (plaintiff's Exhibit 2) reflecting the condition of plaintiff's decedent prior to and up to the time when he was moved from Bay View Hospital on July 16, 1956, and of all the testimony presented to the jury, produces no evidence that he failed to exercise that degree of care which an ordinarily reasonable and prudent person in his physical condition would exercise under the same or similar circumstances.

The fourth reason in support of the second assignment of

error is concerned with the refusal of the trial court to give certain special instructions of law before argument as requested by Dr. Stephen Sheppard. The record discloses that the trial court was given sixty-nine requests to charge before argument and twenty-seven interrogatories to be given to the jury for all defendants. The defendant also requested the trial court to give his general charge in writing so that it would go to the jury. The trial court gave the jury fourteen of the defendant's forty-two requests to charge before argument.

The right of litigants to present to the court written instructions on matters of law and request that they be given to the jury before argument is commenced should be exercised reasonably. The requests should be neither excessive in number or length nor should they be repetitious of the same legal proposition. And further, the court and counsel should be able within a reasonable time to fairly examine and pass upon them. See *American Steel Packing Co.* v. *Conkle*, 86 Ohio St., 117; 99 N. E., 89; *Gibbons* v. *B. & O. Railroad Co.*, 92 Ohio App., 87, 109 N. E. (2d), 511.

The learned trial court correctly refused some of the special instructions requested by defendant because they were not correct and complete statements of the law, and generally handled this very large number of requests without any prejudice to the rights of the defendant.

We find no prejudicial error in the trial court's general charge to the jury as asserted in the defendant's fifth reason in support of the second assignment of error.

As to the alleged error in the failure of the trial court to submit certain interrogatories to the jury, charged in the sixth reason, we find that the trial court properly refused to submit these interrogatories.

Interrogatories S1, S2, S3, S4 and S5 all relate to "the recognized standard of medical practice in this and similar communities," and the plaintiff's claim of negligence is not based upon defendant's failure to meet *that* standard but rather on the defendant's failure to exercise that degree of care which a reasonable and prudent person in the same profession or calling would have exercised in the same or similar circumstances, which degree of care may or may not be met by following the

recognized customs and standards of medical practice in this community.

Customary conduct or methods of treatment which are generally employed by physicians and surgeons in the diagnosis, care and treatment of a patient do not furnish a test which is controlling on the question of negligence, or fix a standard by which negligence can be gauged.

It is the law of Ohio that usual and customary methods generally employed by physicians and surgeons in the diagnosis, care and treatment of a patient, no matter how long such methods have continued to be employed, cannot avail to prove and establish as safe in law methods and conduct which are in fact negligent.

Evidence of conformity to such usual and customary methods, however, may, and should, be considered by the jury, along with all of the other circumstances in the case, in determining whether or not the physician or surgeon exercised the degree of care required of him under the law. See *Ault* v. *Hall*, 119 Ohio St., 422, 164 N. E., 518, and *King* v. *Edwards*, 13 Ohio Law Abs., 424, 37 O. L. R., 356 (App.).

So, these special interrogatories relating to evidentiary rather than to ultimate, controlling and determinative facts were properly not submitted to the jury. See *Reed* v. *Pearl Assurance Co.*, 82 Ohio App., 293, 80 N. E. (2d), 232.

Interrogatories S6, S7, S8 and S9 related to the question of contributory negligence which the trial court correctly held was not in the case.

In the seventh reason in support of the second assignment of error, defendant-appellant charges an abuse of discretion by the trial court in requiring the jury to deliberate for four days. We do not so find. On the contrary, the trial court in the exercise of a sound discretion properly permitted ample time for deliberation of a case which required twenty-eight trial days for the actual trial.

Finally, we find no merit in defendant-appellant's last reason to the effect that the verdict of the jury and judgment of the trial court are not sustained by sufficient evidence and are contrary to law.

For the above reasons, the judgment of the Court of Common Pleas is affirmed.

Judgment affirmed. Exceptions noted.

HURD, P. J., and ARTL, J., concur.