## NACCARATO v. GROB

1. PHYSICIANS AND SURGEONS—SPECIALISTS—NEGLIGENCE—STAND-
   ARD OF CARE—WITNESSES.

   The standard of care for a specialist should be that of a rea-
   sonable specialist practicing medicine in the light of present
   day scientific knowledge; therefore, geographical considera-
   tions or circumstances control neither the standard of a spe-
   cialist's care nor the competence of an expert's testimony.

2. WITNESSES — EXPERTS — PHYSICIANS AND SURGEONS — PEDIATRI-
   CIANS — NEGLIGENCE — STANDARDS OF PRACTICE.

   Expert witnesses, a world-renown expert on phenylketonuria
   from Chicago and another recognized expert on that disease
   who practiced medicine and did research in Los Angeles, are
   qualified, in a malpractice action against Detroit area pedia-
   tricians for failure to timely diagnose phenylketonuria, to
   testify concerning the standards of practice of pediatricians.

3. DAMAGES — NEGLIGENCE — MALPRACTICE — PHYSICIANS AND
   SURGEONS — PEDIATRICIANS.

   The first pediatrician treating plaintiff is liable for the full
   amount of plaintiff's damages and the second pediatrician,
   who began treating plaintiff later, is liable only for that
   portion of damages fairly found to have occurred after his
   treatment of plaintiff had begun where both pediatricians
   independently treated plaintiff and their negligence was the
   failure to administer a test for phenylketonuria, a progres-
   sively deteriorating disease.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 41 Am Jur, Physicians and Surgeons §§ 87, 90.
   Physicians and surgeons: Standard skill and care required of
      specialist. 21 ALR3d 953.
[3] 22 Am Jur 2d, Damages § 14.
   38 Am Jur, Negligence § 68.
   Liability of one physician or surgeon for malpractice of another.
      85 ALR2d 889.
[4] 52 Am Jur, Torts § 123.

4. JURY — VERDICT — NEGLIGENCE — PHYSICIANS AND SURGEONS —
DAMAGES.

Verdict of $80,000 in favor of plaintiff against two pediatricians
with a "split" of $60,000 against the first treating pediatrician
and $20,000 against the second treating pediatrician, in a
malpractice action for failure to administer a test for phen-
ylketonuria, a progressively deteriorating disease, meant that
the final $20,000 liability of the first treating pediatrician was
joint and several and that he was severally liable as to the
$60,000 and that the second pediatrician, who began treatment
later, was jointly and severally liable for the final $20,000.

Appeal from Court of Appeals, Division 1, J. H.
Gillis, P. J., and Fitzgerald and McGregor, JJ., af-
firming Wayne, George E. Bowles, J.    Submitted
November 5, 1969.   (No. 14 October Term 1969,
Docket No. 52,132.)    Decided November 12, 1970.
Rehearing denied February 1, 1971.

12 Mich App 130 reversed.

Complaint by Nunzio M. Naccarato, as next friend
of John Francis Naccarato, a minor, against Otto
Grob and David Krevsky, for damages for medical
malpractice.   Verdict for plaintiff.   Judgment for
defendants notwithstanding the verdict.   Plaintiff
appealed to the Court of Appeals.   Affirmed.   Plain-
tiff appeals.   Reversed and remanded.

*Davidson, Gotshall, Halsey, Kohl, Nelson, Secrest
& Wardle* (by *Richard H. Scholl*), for plaintiff.

*Moll, Desenberg, Purdy, Glover & Bayer,* for de-
fendant.

T. G. KAVANAGH, J.   The plaintiff brought this suit
against two Detroit area pediatricians for their al-
leged malpractice in failing timely to diagnose
phenylketonuria (PKU).   (PKU is a rare childhood
disease which begins at birth and results in progres-

sive mental deterioration. The sooner a diagnosis of PKU is made and treatment begun, the higher the intelligence quotient [IQ] of the child will be.) The trial court granted defendants' motion for a judgment n.o.v.,[1] overturning a jury verdict for plaintiff in the amount of $80,000, and plaintiff appeals.

We are not concerned in this appeal with the medical wisdom of the two pediatricians, nor in the timetable of years which passed before the disease of the plaintiff was discovered and treatment begun. Rather, the trial court set aside the jury verdict on the grounds that two of the plaintiff's expert witnesses were incompetent to testify and, without their testimony, the trial judge felt the verdict could not stand. Plaintiff asserts that this was error. He feels, first that the testimony was competent and second, in any event, the record contained sufficient evidence to sustain the jury's verdict.

The defendants acknowledge that Dr. David Hsia of Chicago, Illinois, is a world-renowned expert on phenylketonuria. Dr. Hsia testified that commercial medicines and special dietary programs were available for children suffering from PKU throughout the period of time when the plaintiff child remained untreated. He also testified to the effect that tests for PKU were easy to make and routinely made in the hospitals of the nation. In reaching his conclusion he stated:

"[T]hat any resident who has been trained and who is a certified pediatrician would be expected to be, in a hospitalized patient anywhere in the country, to routinely test for phenylketonuria as part of a mental retardation workup in a hospital. I don't

[1] In reaching his verdict the trial judge relied on *Zoterell v. Repp* (1915), 187 Mich 319, *Lince v. Monson* (1961), 363 Mich 135, and *Skeffington v. Bradley* (1962), 366 Mich 552, all of which dealt with the standard of care of a general practitioner.

think anyone in 1960, I mean whether this is in De-
troit or Chicago or in Oshkosh, it doesn't really make
any difference. This is the established standard for
anyone who is a board certified pediatrician, pe-
riod."[2]

The trial court also struck the testimony of Dr.
Richard Koch, another recognized expert on PKU,
who practiced medicine and did research in the City
of Los Angeles, California. His testimony concerned
the dissemination of the knowledge of PKU through-
out the nation, and the standard of care which should
have been employed by Detroit physicians as it was
in similar communities where large medical centers
were located.[3]  Dr. Koch testified that he was aware
of the standard of care exercised by pediatricians in
urban metropolitan communities such as Detroit or
similar communities. Referring specifically to the
disease of phenylketonuria, Dr. Koch testified that
he was familiar with the standard of practice ex-
ercised in large metropolitan communities insofar
as the diagnosis, care and treatment of children
with phenylketonuria is concerned during the years
in question of 1958, 1959, and 1960 and that, in his
opinion, the physician in a clinical setting practices
at the same level of competence as a private, board
certified pediatrician.

In answer to the hypothetical question put to
Dr. Koch as to the standard of care followed by
defendant Grob (at this time no test for phenylke-
tonuria was performed by defendant Grob to deter-
mine the cause of the mental retardation of John
Naccarato) Dr. Koch testified:

---

[2] Both defendants were board certified pediatricians.

[3] The Wayne State University Medical School, The University of
Michigan Medical School, The Children's Hospital and Henry Ford
Hospital are well known throughout the medical world. Dr. Koch
referred to their well known reputations on several occasions.

"I believe that a practicing board certified pediatrician in January of 1960 who was evaluating a mentally retarded child should have included a test for phenylketonuria."

In opposing the qualifications of the plaintiff's experts, the defendants introduced the testimony of three Detroit area doctors. Drs. Martmer, Wooley and Adams testified that it was not the common practice for pediatricians in the Detroit metropolitan area to use the recognized tests for PKU during the time period in question, because the disease was so rare. Their testimony was to the effect that the defendants did not vary from the usual "standard of care" of pediatricians in the Detroit area. They did admit in various manners that most pediatricians knew of the disease and of the treatment then available for use. The defendants conceded that they knew of the test.

In the written opinion of the trial court overturning the jury verdict the court held that the testimony of the plaintiff's experts could not be considered by the jury as worthy of belief regarding the standards of actual private practice of the physicians in the Detroit area during the time period in question. Plaintiff however believes that his witnesses could have assumed that standards of physicians in the Detroit area were comparable with any other metropolitan areas where large medical centers were engaged in PKU research. The trial judge rejected this contention and repeatedly emphasized that the plaintiff's experts lacked sufficient knowledge concerning the usual practice of Detroit area pediatricians.

It is unnecessary at this juncture to reexamine whether the practice of the community should be the standard to which all area general practitioners should be held. Rather, at issue here is the com-

petency of acknowledged experts to testify as to the practice of a pediatrician, a specialist, in diagnosing and treating PKU.

In reaching our decision today, we rely on the reasoning in *Wood* v. *Vroman* (1921), 215 Mich 449: (Where the defendant holds himself out as a specialist he) is "obligated to bring to the discharge of his duty that degree of skill and knowledge possessed by physicians who are specialists in the *light of present day scientific knowledge.*" (*Wood* v. *Vroman, supra,* 465, 466.) (Emphasis added.)

It is therefore unnecessary to consider in this opinion whether a standard of parochial negligence can obviate the requirement of reasonable care by a local practitioner.[4] At issue here is the standard of care owed to a patient by a community of specialists. Whatever the considerations were that allowed the area practice to set the standard for the country general practitioners—they are not relevant to a metropolitan specialist—calling a specialist parochial or bucolic is hardly appropriate.[5]

The reliance of the public upon the skills of a specialist and the wealth and sources of his knowl-

---

[4] A series of states in recent years have abandoned or modified the "locality rule". Two of the most representative cases are *Brune* v. *Belinkoff* (1968), 354 Mass 102 (235 NE2d 793) and *Pederson* v. *Dumouchel* (1967), 72 Wash 2d 73 (431 P2d 973). *Brune* fully reviews many of the recent decisions in other states. Almost 40 years ago this Court recognized the burgeoning national community of specialists in *Wood* v. *Vroman* (1921), 215 Mich 449.

[5] "[U]sual and customary methods generally employed by physicians and surgeons in the diagnosis, care and treatment of a patient, no matter how long such methods have continued to be employed, cannot avail to prove and establish as safe in law methods and conduct which are in fact negligent.

"Evidence of conformity to such usual and customary methods, however, may, and should, be considered by the jury, along with all of the other circumstances in the case, in determining whether or not the physician or surgeon exercised the degree of care required of him under the law." *Morgan* v. *Sheppard* (Ohio App 1963), 188 NE2d 808,

edge are not limited to the geographic area in which he practices. Rather his knowledge is a speciality. He specializes so that he may keep abreast. Any other standard for a specialist would negate the fundamental expectations and purpose of a speciality. The standard of care for a specialist should be that of a reasonable specialist practicing medicine in the light of present day scientific knowledge. Therefore, geographical conditions or circumstances control neither the standard of a specialist's care nor the competence of an expert's testimony.

We are at this time as conscious as this Court was in 1931 that:

"At times it may become necessary to secure the expert testimony of one who resides some distance from the home of a defendant accused of malpractice, for it may be difficult to obtain a witness to testify against one who bears the very high professional reputation of defendant. * * * What credence should be given to the expert's statements is another matter. That was the province of the jury." *Sampson* v. *Veenboer* (1931), 252 Mich 660, 667.

We hold that the plaintiff's expert witnesses were qualified to testify concerning the standard of practice of pediatricians and accordingly overrule the judgment n.o.v. and reinstate the jury's verdict.

There is one further assertion of error—this by the defendant.

The defendant-appellees asserted in their answering brief that the form of the jury's verdict was improper and ambiguous and asked if we set aside the judgment *non obstante veredicto* we remand this case for a new trial.

GCR 1963, 813.1 requires that an issue not suggested by the plaintiff's statement of questions in-

volved will not be considered here. It properly should have been asserted as a cross-appeal.

This issue was not raised in the Court of Appeals and we normally will not consider such matters for the first time in this Court. Because GCR 1963, 865.1(8) provides that we should grant whatever relief we deem just after setting aside a judgment *non obstante veredicto,* we treat the issue thus raised.

The ambiguity of the verdict is possibly the result of an erroneous instruction by the trial judge,[6] on the issue of joint and several liability. The jury however returned a verdict "in favor of the plaintiff", in the sum of $80,000. When asked "against which defendant or defendants?", the foreman responded: "The split is $60,000 for Dr. Otto Grob and $20,000 for Dr. Krevsky."

Counsel and the judges then retired to his chambers where a discussion was had on the form of the verdict. It was pointed out by counsel for the defendant that PKU is a progressively deteriorating disease; that the doctors independently treated the plaintiff and their negligence was that of omission in failing to administer a test for the disease. As a result, defendant contended, the first of the treating Doctors, Dr. Grob, should be liable for the full amount of the plaintiff's damages and the second treating Doctor, Dr. Krevsky ought to be liable for only that portion of damages fairly found to have occurred after his treatment of the plaintiff had begun. We agree.

However we find that this was the fair import of the jury's verdict. When polled by the court, the jury affirmed that they found "for the plaintiff

---

6 "You must assess and determine the liability of, if any, the defendants separately. If you should hold for plaintiff against both defendants, after your due deliberation, any verdict would be apportioned; that is, it would be in one lump sum, but you must assess the liability, if any, of the defendants separately."

and against the defendant in the sum of $80,000." We held in *Rabion* v. *Kelley* (1916), 194 Mich 107, at 117, "There can be no doubt that where the intentions of the jury are ascertainable the court may amend the verdict, correcting manifest errors of form, and sometimes matters of substance, to make it conform to the intentions of the jury."

In this case, the jury's intention is apparent— they found the plaintiff's damages totaled to $80,000. They endeavored to allocate the burden between the parties and failed. This possibly was due to the error in the instructions.

We believe the jury intended to allocate the burden as follows: As to the final $20,000 liability of Dr. Grob, that the jury would have held him jointly and severally liable to that amount and severally liable as to the $60,000. We further hold that defendant Dr. Krevsky is jointly and severally liable for the final $20,000. This is the import of the jury's verdict. The error was one of form only.

The Court of Appeals is reversed and the cause remanded for the entry of judgment in accord with this opinion.

Costs to appellant.

T. E. BRENNAN, C. J., and T. M. KAVANAGH and ADAMS, JJ., concurred with T. G. KAVANAGH, J.

BLACK, J., concurred in result.

DETHMERS and KELLY, JJ., did not sit in this case.