*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RUDOLPH WIDMAR, Personal Representative of
the ESTATE OF DOUGLAS WIDMAR,

        Plaintiff-Appellee,

v

WILLIAM BEAUMONT HOSPITAL, DR. MARK
FRIKKER, MARIO RAUL VILLALBA, MD,
SHRUTI SEVAK, and EMILY ABBOTT,

        Defendants-Appellants,

and

JEFFREY S. FISCHGRUND, MD, DR. JAD
KHALIL, DR. WAEL GHACHAM, BEAUMONT
ORTHOPEDIC CENTER, DR. LILLY, and
ANDREW PALAZZOLO, MD,

        Defendants.

UNPUBLISHED
November 9, 2023

No. 362012
Oakland Circuit Court
LC No. 2018-169341-NH

Before: CAVANAGH, P.J., and RIORDAN and PATEL, JJ.

PER CURIAM.

In this wrongful-death medical malpractice action, defendants William Beaumont
Hospital, Dr. Mark Frikker, Dr. Mario Raul Villalba, Dr. Emily Abbott, and Dr. Shruti Sevak
(collectively "defendants") appeal by leave granted the trial court's order denying their motion in
limine to strike plaintiff's standard-of-care expert, Dr. Steven Salzman, D.O., and to preclude him
from giving expert testimony regarding the standard of care applicable to these defendants. We
conclude that the one most relevant specialty applicable to these defendants is surgical critical
care. Although Dr. Salzman specializes in surgical critical care, because Drs. Frikker and Villalba
are board-certified in surgical critical care, and Dr. Salzman is not, Dr. Salzman is not qualified
under MCL 600.2169(1)(a) to testify regarding the standard of care applicable to Drs. Frikker and
Villalba. However, because Drs. Sevak and Lilly similarly are not board-certified in surgical

-1-

critical care, Dr. Salzman's lack of board certification in that specialty does not disqualify him from providing standard-of-care testimony against them. Accordingly, we affirm in part, reverse in part, and remand to the trial court for further proceedings.

## I. FACTS AND PROCEEDINGS

This action arises from treatment that plaintiff's decedent, Douglas Widmar, received at Beaumont Hospital in October 2015. The decedent sustained traumatic injuries when he accidentally crashed his ultralight plane on October 8, 2015. Emergency responders intubated him with an endotracheal ventilator before transporting him to the surgical intensive care unit at Beaumont Hospital. His injuries included a nondisplaced cervical spinal fracture, other spinal fractures, fractures in both legs, a traumatic head injury, and a punctured lung. An orthopedic team decided to treat the cervical spinal fracture without surgery, by placing the decedent's neck in a collar while the fracture healed naturally.

The decedent remained on a ventilator until October 21, 2015, when Dr. Frikker made the decision to perform a percutaneous tracheostomy. This procedure is performed bedside rather than in an operating room. The purpose of the procedure is to begin weaning the patient off the ventilator. It is typically done for patients who have been on a ventilator for 14 days or more. Performing a percutaneous tracheostomy on a patient with a cervical spinal fracture carries the risk of displacing the fracture.

Dr. Frikker and Dr. Villalba are board-certified specialists in general surgery and surgical critical care.[1] Dr. Sevak and Dr. Abbott were surgical residents working under Dr. Villalba's supervision. These four defendants performed the percutaneous tracheostomy procedure on the decedent. On October 22, 2015, the day after the procedure, the decedent showed signs of paralysis on his right side. The orthopedists treating him decided that the cervical fracture required surgical treatment. The "fixation" surgery was performed on October 22. Plaintiff contends that the decedent was not quadriplegic before the tracheostomy was performed. In November 2015, the decedent was discharged from Beaumont Hospital and admitted to the University of Michigan spinal rehabilitation unit. He was later transferred to a Veterans Administration Hospital in Ohio. He died on February 11, 2017.

---

[1] Specifically, Dr. Frikker and Dr. Villalba are certified by the American Board of Surgery in surgical critical care. The American Board of Surgery defines "surgical critical care" as "a specialty of surgery and a primary component of general surgery related to the care of patients with acute, life-threatening or potentially life-threatening surgical conditions." See https://www.absurgery.org/default.jsp?aboutsccdefined#:~:text=Surgical%20critical%20care%20 0is%20a,potentially%20life%2Dthreatening%20surgical%20conditions (accessed November 2, 2023).

Plaintiff alleges that defendants negligently performed the percutaneous tracheostomy procedure without taking sufficient safeguards to avoid displacement of the cervical fracture.[2] According to plaintiff, the residents used excessive force when they implanted the tracheostomy device, causing displacement of the fracture and dissection of a vertebral artery. This necessitated urgent corrective surgery and a Halo brace. Plaintiff's complaint was supported by an Affidavit of Merit (AOM) executed by Dr. Steven Salzman, D.O. Dr. Salzman opined that the tracheostomy should have been performed in the operating room or not performed until the cervical fracture was healed. Dr. Salzman is board-certified in the specialty of general surgery, but not the specialty of surgical critical care. Dr. Frikker and Dr. Villalba are board-certified in both specialties. The residents have no board certifications.

Defendants moved in limine to strike Dr. Salzman as a standard-of-care expert. They argued that he was not board-certified in surgical critical care, and therefore, was not qualified to testify against Dr. Villalba and Dr. Frikker, both of whom were board-certified in surgical critical care. Defendants also argued that Dr. Salzman could not testify as an expert in the field of general surgery because he spent the majority of his professional time practicing surgical critical care. Plaintiff argued that defendants were practicing the specialty of general surgery when they performed the percutaneous tracheostomy. The trial court found that there was a question of fact regarding the specialty that defendants were practicing and denied defendants' motion in limine. This Court granted defendants' interlocutory application for leave to appeal.

## II. ANALYSIS

"This Court reviews for an abuse of discretion the 'qualification of a witness as an expert and the admissibility of the testimony of the witness . . . .' " *Lenawee Co v Wagley*, 301 Mich App 134, 161; 836 NW2d 193 (2013), quoting *Surman v Surman*, 277 Mich App 287, 304-305; 745 NW2d 802 (2007). "An abuse of discretion occurs when a circuit court chooses a result that falls outside the range of reasonable and principled outcomes." *Lenawee Co*, 301 Mich App at 162. Any preliminary questions of law, including the interpretation and application of statutes, are reviewed de novo. *Mueller v Brannigan Bros Restaurants & Taverns, LLC*, 323 Mich App 566, 571; 918 NW2d 545 (2018). "[T]he trial court necessarily commits an abuse of discretion if it makes an incorrect legal determination." *Id*.

The four elements that a plaintiff must prove in an action for medical malpractice are:

(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care. [*Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).]

---

[2] Plaintiff also named as defendants other orthopedic doctors who were involved in other aspects of the decedent's treatment and care, but they are not parties to this appeal. This appeal only involves plaintiff's claims against the defendants who participated in the percutaneous tracheostomy.

With respect to the standard of care for a specialist, "the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice" that the defendant "failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances . . . ." MCL 600.2912a(1)(b). The standard of care applicable to a specialist in a medical malpractice action is "that of a reasonable specialist practicing medicine in the light of present day scientific knowledge." *Naccarato v Grob*, 384 Mich 248, 254; 180 NW2d 788 (1970).

MCL 600.2169(1) provides, in pertinent part:

> In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:
>
> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.
>
> (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

A. TRIAL COURT'S ROLE AS GATEKEEPER

A threshold issue is whether the trial court erred by ruling that the jury could decide the issue whether general surgery or critical care medicine was the most relevant specialty for the decedent's tracheostomy procedure. The trial court "may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). "This gatekeeper role applies to all stages of expert analysis." *Id.* (emphasis omitted). In *Woodard v Custer*, 476 Mich 545, 570-572; 719 NW2d 842 (2006), our Supreme Court held that it is the role of the trial court, and not the jury, to determine which of a defendant physician's specialties is relevant for purposes of

determining an expert's witness's qualification. The Court alluded to the trial court's well-established gatekeeping role in determining the reliability of expert testimony. *Id*. at 571 n 16. Thus, the trial court erred by delegating that decision to the jury.

## B. MOST RELEVANT SPECIALTY

In *Woodard*, the defendant physician was board-certified in pediatrics, with certificates of special qualifications in pediatric critical care medicine and neonatal-perinatal medicine. *Id*. at 554. The plaintiff's proposed expert was board-certified in pediatrics, but without certificates of special qualifications. *Id*. at 554-555. The trial court granted the defendant's motion to strike the plaintiff's expert on the ground that he was not qualified under MCL 600.2169 to testify against the defendant physician. *Id*. at 555. In *Woodard*'s companion case, *Hamilton v Kuligowski*, the defendant physician was board-certified in general internal medicine, with a specialty in general internal medicine. *Id*. at 556. The plaintiff's proposed expert was board-certified in general internal medicine, and devoted a majority of his professional time to the treatment of infectious diseases, a subspecialty of internal medicine. *Id*. The trial court concluded that the plaintiff's expert was not qualified to testify against the defendant physician because the plaintiff's expert did not devote the majority of his professional time to the practice or teaching of general internal medicine. *Id*. The Supreme Court explained:

> Although specialties and board certificates must match, not *all* specialties and board certificates must match. Rather, § 2169(1) states that "a person shall not give expert testimony on the *appropriate* standard of practice or care unless . . . ." (Emphasis added.) That is, § 2169(1) addresses the necessary qualifications of an expert witness to testify regarding the "*appropriate* standard of practice or care," not regarding an inappropriate or irrelevant standard of medical practice or care. Because an expert witness is not required to testify regarding an inappropriate or irrelevant standard of medical practice or care, § 2169(1) should not be understood to require such witness to specialize in specialties and possess board certificates that are not relevant to the standard of medical practice or care about which the witness is to testify. As this Court explained in *McDougall v Schanz*, 461 Mich 15, 24-25; 597 NW2d 148 (1999), "[MCL 600.2169(1)] operates to preclude certain witnesses from testifying solely on the basis of the witness' lack of practice or teaching experience in the *relevant* specialty." (Emphasis added.) [*Woodard*, 476 Mich at 558-559.]

The Court also noted that § 2169(1) uses the terms "the same specialty" and "that specialty," not "the same specialties" or "those specialties." *Woodard*, 476 Mich at 559. The Court further stated:

> Obviously, a specialist can only devote a majority of his professional time to one specialty. Therefore, it is clear that § 2169(1) only requires the plaintiff's expert to match one of the defendant physician's specialties. Because the plaintiff's expert will be providing expert testimony on the appropriate or relevant standard of practice or care, not an inappropriate or irrelevant standard of practice or care, it follows that the plaintiff's expert witness must match the one most relevant standard of practice or care—the specialty engaged in by the defendant physician

during the course of the alleged malpractice, and, if the defendant physician is board certified in that specialty, the plaintiff's expert must also be board certified in that specialty. [*Id*. at 560 (emphasis omitted).]

Regarding the meanings of the words "specialty" and "subspecialty," the Court stated that a "subspecialty" is "a particular branch of medicine or surgery in which one can potentially become board-certified that falls under a specialty or within the hierarchy of that specialty." *Id*. at 562. "[I]f a defendant physician specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action." *Id*. "[I]n order to be qualified to testify under § 2169(1)(b), the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty." *Id*. at 566.

The Supreme Court concluded that the plaintiff's proposed expert in *Woodard* did not satisfy the same specialty requirement because the defendant specialized in pediatric critical care medicine, pediatric critical care medicine was the most relevant specialty, and the plaintiff's expert did not practice or teach pediatric critical care medicine in the year preceding the alleged malpractice. *Id*. at 577. The Court stated that " 'Critical' is defined as '[d]enoting a morbid condition in which death is possible.' " *Id*. at 576, quoting *Stedman's Medical Dictionary* (26th ed.) (alteration in original). In *Hamilton*, the Court concluded that the plaintiff's expert witness "did not devote a majority of his time to practicing or teaching general internal medicine" because he instead "devoted a majority of his professional time to treating infectious diseases." *Id*. at 578. The witness acknowledged that he was "not sure what the average internist sees day in and day out." *Id*.

*Woodard* establishes that it is necessary to consider all relevant circumstances in determining what specialty defendants were practicing when they performed the tracheostomy. The mere fact that a tracheostomy may be considered a relatively simple or straightforward procedure, or the fact that the procedure was performed in the intensive care unit (ICU), are not dispositive. The analysis requires consideration of the definition of the practice of surgical critical care. In *Woodard*, 476 Mich at 575, the Court noted that *Stedman's Medical Dictionary* defines "critical" as " '[d]enoting a morbid condition in which death is possible.' " Defendants quote the Medline Plus website, which states:

> Critical care is medical care for people who have life-threatening injuries and illnesses. It usually takes place in an intensive care unit (ICU). A team of specially-trained health care providers gives you 24-hour care. This includes using machines to constantly monitor your vital signs. It also usually involves giving you specialized treatments.[3]

---

[3]https://medlineplus.gov/criticalcare.html#:~:text=Critical%20care%20is%20medical%20care,constantly%20monitor%20your%20vital%20signs (accessed October 3, 2023).

Defendants argue that Dr. Salzman's testimony demonstrates that defendants were practicing in the area of critical care when they performed the particular percutaneous tracheostomy at issue in this case, given the decedent's other injuries. Indeed, Dr. Salzman stated that a tracheostomy is contraindicated in a patient with a cervical spine injury. He stated that there are risks, including life-threatening risks, associated with oral endotracheal intubation, but these risks had to be balanced against the benefit of maintaining a stable airway. At the time of the decedent's hospitalization, the "teachings were you wanted to try to change over if you can't get the patient off the ventilator." It was considered preferable "to change an endotracheal tube to a tracheostomy tube so that you can potentially wean them, suction them, and all of these other things and potentially try to get them off the vent quicker in all of these things." Patients on an endotracheal tube needed to be sedated. There was risk of pneumonia. When the decedent was admitted to the hospital, he had a Glasgow Coma Score of 3, meaning that he was unable to breathe independently. The decedent's multiple injuries put him at a high risk for mortality. He had lumbar spine fractures, a fractured hip, fractures in both legs, and his lung was punctured. He was unconscious. He had significant head and neck trauma. The neck trauma put him at risk of a vertebral artery dissection.

Dr. Salzman acknowledged in his deposition that his AOM "alludes to violations of the standard of practice for orthopedic surgeons, general surgeons, trauma and critical care surgeons, anesthesiologists and internists." When asked, "You are not offering opinions regarding orthopedic surgeons; is that true?" he replied, "My opinions are based on the trauma critical care aspects of this." Defendants argue that this testimony established that Dr. Salzman's opinions were based on the standard of care for critical care treatment. Defendants also argue that Dr. Salzman's opinion that the tracheostomy should have been performed in the operating room and not until the decedent's cervical fracture was surgically stabilized are critical care issues. Defendants also cite Dr. Salzman's testimony that there are life-threatening risks associated with prolonged use of an oral endotracheal tube, and that the change to the tracheostomy should be done if the patient cannot be weaned after 14 days. When asked if the decedent had a very high risk of death on October 8, 2015, Dr. Salzman replied, "He was critically injured. I don't know about high risk of death. I think anybody who is a trauma patient, quote-unquote, is at a potential risk of death." He also stated, "I think anybody that is critically injured like that is at high risk for mortality. I don't know that we can put a number on it." Dr. Salzman stated that the decedent's head trauma put him at risk of long-term neurologic impairment.

Plaintiff states that defendants testified in their depositions that the tracheostomy was an "elective" procedure, but the cited testimony does not fully support this assertion. Dr. Abbott answered affirmatively when asked whether the tracheostomy was an "elective procedure" and whether it was not "mandatory to save his life and it wasn't something that had to be done on October 21st." Dr. Abbott stated that she could not give a medical reason for performing the "elective percutaneous trach" before the fixation surgery on October 22. Dr. Sevak agreed that the procedure was elective. Dr. Jeffrey Fischgrund was asked if the tracheostomy "was a required event or an elective event?" He agreed that "it didn't probably have to be done that minute, but the recommendation would be done at some time." When asked why the tracheostomy was done before the decedent's neck was surgically stabilized, Dr. Frikker stated:

The two things were quite independent. It's our practice, and the practice around the country, that when someone has been on the ventilator, with an oral tracheal

tube for about two weeks, and there's no immediate prospect of getting that tube removed, then it's safer and more comfortable for the patient to move that tube to a tracheostomy position.

When Dr. Salzman testified that defendants violated the standard of care by performing the tracheostomy at bedside rather than in an operating room, he stated, "You are in a suboptimal environment, performing an elective procedure that clearly needed to be done, except it needed to be done at the appropriate time which it wasn't because this patient should have been brought to the OR."

Considering all the relevant circumstances, we conclude that the decedent was a critical care patient under either party's definition of critical care. The decedent had multiple injuries, including a traumatic head injury and multiple spinal fractures. Dr. Salzman's theory was that the procedure should have been conducted in an operating room because the decedent's cervical spine injury put him at a high risk of death or serious injury. The heightened risk of performing the procedure on a patient with a cervical fracture negates plaintiff's attempt to portray the procedure as routine. Plaintiff emphasizes that the procedure was "elective," but the evidence indicated that it was elective only in the sense that there was no specific need to perform the procedure and start weaning the decedent from the endotracheal ventilator on that specific day and time, but because of the risks of long-term endotracheal ventilation, it had to be done at some point. The purpose of the tracheostomy was not merely to make the decedent more comfortable, but to avoid the long-term risks of intubation.

Plaintiff also compares the decedent's condition before the tracheostomy to his deterioration afterward to demonstrate that he was not a critical care patient until after defendants performed the procedure. Dr. Frikker explained that the original plan for treating the neck fracture was not surgical, but on the morning of October 22, the decedent showed signs of right-sided paralysis. The orthopedic surgeons decided to perform the stabilization because they could not determine the cause of the decedent's right-side paralysis. Dr. Villalba admitted that there were no plans for surgery when they performed the tracheostomy. If there had been plans for surgery, he would have delayed the tracheostomy.

Plaintiff cites testimony of Dr. Jad Khalil in support of his position that the decedent was not at risk of death, and thus not a critical care patient, until after the tracheostomy was performed. Plaintiff quotes Dr. Khalil as saying that he believed the decedent's paralysis on October 22 was "the first instance where we noted that the fracture had displaced and merits surgical treatment." Plaintiff cites Dr. Khalil's testimony in support of his assertion that the decedent was not expected to die on admission, but only destined after November 1 with "a couple of months to live." However, Dr. Khalil's actual testimony was as follows:

> *Q*. For lack of a better term, Mr. Widmar wasn't due to die, was he?
>
> *A*. I don't know the answer to that question, sir.
>
> *Q*. Is there anywhere in the chart where you see anything suggesting between 10/8 and 10/22, that he had a high mortality or morbidity rate?

*A*. Yes. So, the fact that the high energy crash, the brain energy, and the neurologic function that he came with, and I believe he was resuscitated at the scene, so typically, medical literature would say that there is a high risk of mortality for these patients.

Dr. Fischgrund stated that "the fracture that identified on day of admission, in my opinion, did not need surgery." When asked if there was any indication in the decedent's chart before October 22 that the decedent's probability of survival was low, Dr. Fischgrund replied that "it's general knowledge" that a 65-year-old person with a Glasgow Coma Scale Score of 3 had a low chance of survival. He stated that he did not believe surgical treatment was necessary until the fracture was displaced.

Testimony regarding the decedent's need for surgery to treat the cervical fracture on October 22, 2015, does not prove that he was not a critical care patient before and at the time of the tracheostomy. The decedent had multiple injuries. The fact that the orthopedic specialists changed his treatment plan for one of those injuries from noninvasive to surgical intervention does not indicate that his condition was not already critical.

In sum, the evidence establishes that Dr. Villalba and Dr. Frikker were practicing surgical critical care when they performed the percutaneous tracheotomy on the decedent on October 21, 2015. Surgical critical care is therefore the most relevant specialty. Because Dr. Villalba and Dr. Frikker were both board-certified in surgical critical care, and Dr. Salzman was not, Dr. Salzman was not qualified under MCL 600.2961(1)(a) to testify regarding whether Dr. Villalba or Dr. Frikker breached the applicable standard of care. Accordingly, we reverse in part the trial court's order to the extent that it denied defendants' motion in limine to preclude Dr. Salzman's standard-of-care testimony against Drs. Villalba and Frikker.

## C. THE RESIDENTS

Conversely, the residents, Dr. Abbott and Dr. Sevak, are not board-certified in any specialty. Therefore, if the residents were practicing the specialty of surgical critical care when they participated in the tracheostomy, Dr. Salzman's lack of board certification in that specialty does not disqualify him from offering standard-of-care testimony with respect to Dr. Abbott and Dr. Sevak.[4] Defendants argue, however, that the residents were not practicing surgical critical care for purposes of MCL 600.2169, but rather were merely performing a limited rotation in the ICU as part of their general surgery training. We reject this argument.

In *Gonzalez v St John Hosp & Med Ctr*, 275 Mich App 290, 299; 739 NW2d 392 (2007), this Court held that "those physicians who are residents and limit their training to a particular branch or medicine or surgery and who can potentially become board-certified in that specialty are specialists for purposes of the analysis under MCL 600.2169(1)." In *Reeves v Carson City Hosp*, 274 Mich App 622; 736 NW2d 284 (2007), the defendant physician was board-certified in family

---

[4] The submitted evidence otherwise indicated that Dr. Salzman devoted more than half of his professional time to the practice of surgical critical care, thereby satisfying the requirement in MCL 600.2169(1)(b)(*i*).

practice, but she was practicing in the emergency room when she treated the plaintiff. *Id.* at 628. This Court held that "because Dr. Squanda was practicing emergency medicine at the time of the alleged malpractice and potentially could obtain a board certification in emergency medicine, she was a 'specialist' in emergency medicine under the holding in *Woodard*." *Id.* at 630.

Regarding a resident as practicing the advanced specialty is consistent with the focus on the work being performed in *Reeves*. Indeed, defendants acknowledged in their motion in limine, and Dr. Frikker and Dr. Villalba both averred in their affidavits, that the residents were practicing surgical critical care. We therefore conclude that the residents were engaged in the practice of surgical critical care when they participated in the percutaneous tracheostomy procedure. As a physician who devotes the majority of his time to the practice of surgical critical care, Dr. Salzman was qualified to give standard-of-care testimony against the residents. Accordingly, we affirm the trial court's order to the extent that it denied defendants' motion to preclude Dr. Salzman's standard-of-care testimony against Drs. Abbott and Sevak.

## D. THE PARTIES OTHER ARGUMENTS

The parties raise additional arguments not directly related to the trial court's order denying defendant's motion in limine. Plaintiff argues that if this Court determines that Dr. Salzman is not qualified to give standard-of-care testimony against any of the defendants, it should hold that his testimony is still admissible for other purposes. Defendants argue that if Dr. Salzman is not qualified to give standard-of-care testimony against any of them, this Court should dismiss plaintiff's claims against them. Alternatively, defendants argue that if Dr. Salzman is qualified to testify against the residents, the claims against the residents should still be dismissed because Dr. Salzman did not state in his deposition that they violated the standard of care. These arguments exceed the scope of this appeal. The admissibility of Dr. Salzman's testimony for other purposes is an issue for the trial court to decide under the rules of evidence, after plaintiff has made an appropriate offer of proof and defendants have the opportunity to raise any objections. Further, whether dismissal of plaintiff's claims against Dr. Villalba and Dr. Frikker is required because Dr. Salzman is not qualified to offer standard-of-care testimony against them, and whether Dr. Salzman's testimony supports a finding that the residents breached the applicable standard of care, are issues appropriately raised in a motion for summary disposition in the trial court.

## III. CONCLUSION

Affirmed in part, reversed in part, and remanded to the trial court for further proceedings. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Michael J. Riordan
/s/ Sima G. Patel